## Roshi's Appeal.

1. A religious society, incorporated or not, is but a trustee of a charity and a court of equity will prevent the diversion of property held in trust.

2. A church endowed in connection with an ecclesiastical organization, or in subordination to it, cannot unite with another organization or become independent.

3. The title to the church property of a divided congregation is in that part which is acting according to its own laws; and the right is to be determined by the ecclesiastical laws, &c., which were accepted among them before the suit began.

4. Those not conforming to their laws may form another connection or become independent, but must abandon all claim to the property.

5. A portion of a church declared independence of their ecclesiastical judicatory; the judicatory declared the offices of their elders and deacons vacant, and ordered the election of others for the church. Having thrown off the jurisdiction of the judicatory, they were not entitled to notice of the election.

October 19th 1871.   Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Appeal from the decree of the Court of Common Pleas of *Crawford county:* In Equity: No. 144, to October and November Term 1870.

On the 28th of July 1869, Andrew Koehler, Henry Roshi, Henry Shaffer, Conrad Reitz and John Kramer, filed a bill against Peter Roshi, Adam Hill, Jacob Baner, Adam Gundaker and Robert Koehler.   The bill set out:

1 and 2. In 1836, Thomas Astley conveyed to Rev. P. Zaiser, a minister of the German Reformed Church, and Peter Stein and other members of that church, an acre of land in Greenwood township, Crawford county, for the use of " The German Reformed Church and congregation of Greenwood township;" the grantees erected on the lot a house of worship, which was " consecrated for religious service in accordance to the order, discipline and faith of the German Reformed Church of the United States." In 1854 the building was taken down and a new one erected on the same ground, which was set apart in the same manner and for the same uses.

3. The church had been served until about two years since by ministers of the German Reformed Church; it had always been a member of the Classis and Synod of the German Reformed Church of the United States, and in many instances had been supported by the treasury of the church.

[Roshi's Appeal.]

4. The respondents and others in 1868, assumed to act as elders, deacons and trustees of the church, without proper authority, and took possession of the property above named, and contrary to the "constitution, order and discipline" of the church, placed in the ministerial office, Robert Koehler, one of the respondents, who was not a member of good standing in the German Reformed Church, was not legally elected or installed, and on account of his immoral conduct, was unfit for the ministerial position, and the respondents closed the house of worship against regular German Reformed ministers sent by authority of the church, &c.

5. Upon complaint, St. Paul's Classis, the proper ecclesiastical court, resolved that the German Reformed congregation of Greenwood is a member of the German Reformed Church of the United States; that St. Paul's Classis has jurisdiction over the congregation, and any one not acknowledging this jurisdiction cannot be an officer or member of the congregation; that the officers, elders and deacons in the congregation be declared vacant; that the members who adhere to the faith, doctrine and discipline of the German Reformed Church in the United States, be required to meet, on proper notice, on or before July 15th 1869, and elect elders and deacons and trustees for the congregation.

6 and 7. At an election held in pursuance of these resolutions; Andrew Koehler, Henry Roshi, John Kramer and Conrad Reitz were elected elders and deacons, "and by virtue thereof, are the proper consistory and board of trustees of said church," &c., and were duly installed by a minister of the German Reformed Church.

8. On the 10th and 11th of July complainants took possession of the church and lot of the German Reformed Church, Greenwood, and used the same "for religious services in accordance with the faith, order and discipline of the German Reformed Church."

9. and 10. The respondent afterwards took possession of the church property, and used it in a manner contrary to the authority of the church, and threatened the complainants and their pastor, a regular German Reformed minister, sent by the authority of the church, with violence should they enter the building for the purpose of worship in accordance with the order of the church, and the complainants were thus debarred from the execution of their duties and from using their church property in accordance with the orders of the German Reformed Church, and the design of the original founders.

11. The respondents declared that they are an independent body, not subject to the jurisdiction of St. Paul's Classis, the Synod of the German Reformed Church, or any other ecclesiastical body.

12. The action of respondents in placing in the ministerial

office of the church, a man loose from the restrictions on regular ministers by ecclesiastical courts, produced a demoralizing influence in the neighborhood, and if the respondents should not be restrained irreparable injury will be done.

13. The complainants have no remedy at law.

The prayers were that the respondents might be declared trespassers and intruders, and that an injunction be granted restraining the defendants and any one under them from interfering which the said church property; and for general relief.

The respondents' answer admitted the averments of the 1st, 2d and 3d paragraphs of the bill, except that the church was attached to the German Reformed Church of the United States, and supported from its treasury, which they denied; and they averred that the church and congregation from its origin had been independent, electing its own ministers, elders, deacons and trustees, and that no classis or synod of the German Reformed Church, or any other church, had any control or jurisdiction over said church, as appeared by their constitution and by-laws; they denied the 4th paragraph, and averred that they had been elected to their offices and duly installed in accordance with their constitution and by-laws, and they did the acts complained of in the paragraph in the legitimate exercise of their offices; that Rev. Robert Koehler was properly elected pastor of the church, was a minister of the church in good standing, not defective in moral character, and was fitted for the ministerial office; they were ignorant as to the matters of the 5th, 6th, 7th and 8th paragraphs, but if true, they averred that St. Paul's Classis had no authority to declare their offices vacant, and all that had been done in pursuance of those matters were null and void; they averred that they peaceably repossessed themselves of the house and lot, in strict conformity with their rights and duties as officers of the church, had never used them contrary to the authority of the church, but always in conformity with it; they denied that the plaintiffs were officers, as alleged in the 9th paragraph; they admitted the 11th paragraph, and denied the 12th and 13th, averring that the plaintiffs had a remedy at law.

A replication was filed, and G. W. Hecker, Esq., appointed examiner and master.

The master reported that the congregation had been organized in 1835, by the Rev. Philip Zaiser, as minister of the German Reformed Church in the United States, by the authority of the synod, who upon his report accepted it as a member of that church, and the lot was conveyed for their use, as set out in the bill. St. Paul's Classis was formed in 1861, and the church was represented in it by a lay delegate in each of the years from 1861 to 1867 inclusive. On the 1st of January 1868, Peter Roshi, Adam Hill, Jacob Bauer and Adam Gundaker were elected elders and deacons;

[Roshi's Appeal.]

and then Rev. Robert Koehler took charge of the congregation as pastor and the congregation soon after divided into about equal parts. On the 21st of January 1869, complaint was made to two of the elders, charging Mr. Koehler with immoral conduct and demanding an investigation; the investigation was denied. Complaint against this action was made to St. Paul's Classis, who appointed a committee to investigate the matter and report such action as might be proper to the next annual meeting of the Classis.

The committee, amongst other things reported, that the parties in possession denied the authority of the Classis, and were not served by one of her ministers and disregarded the rules of the Reformed Church; that those acting with the complainants were a majority of the original congregation and were faithful to the authority of the church, and had been imposed on by men who improperly style themselves the consistory of Greenwood Church, and who had forced on the congregation R. Koehler as a minister, without submitting to an election of the people; the report of the committee set out other failures of duty by the consistory; and further, that they allowed R. Koehler to preach whilst under a charge for immoral conduct, and the committee had ascertained the charge to be well founded; although the consistory refused to take notice of the complaint, all the consistory but one had been acting without having been regularly installed. Under all the facts the committee concluded that the Greenwood Church had no properly constituted consistory, and that the offices of elders and deacons were vacant. They further reported that the congregation had been founded as "a German Reformed Congregation subject to the authority of the German Reformed Church," and in that capacity acquired the property; that the church had been served for about twenty-eight years, except three or four years of trouble in the church, by German Reformed ministers; the church had been on her own application, united by the Classis with other congregations to make a change; had participated during that time in the election of delegates to Classis and by numerous other acts shown that she regarded herself "a member of our church," and it would be gross neglect in the Classis to permit its destruction "as one of our body by non-interference and silence against the machinations of secession and infidelity." The committee recommended the passage of resolutions by the Classis as follows:

1. That the German Reformed Congregation at Greenwood, was a member of the German Reformed Church in the United States, that St. Paul's Classis had jurisdiction of the congregation, and that any one not acknowledging that jurisdiction could not be an officer or member of the congregation.

2. That the offices of elders and deacons of the church be declared vacant.

3. That the members adhering to the faith, discipline and

19 P. F. Smith—30

[Roshi's Appeal.]

doctrine of the German Reformed Church, be required to meet, on proper notice, on or before the 15th day of July 1869, to elect. elders and deacons, to act as a consistory and a board of trustees in the congregation.

These resolutions were adopted by the Classis, June 7th 1869, and on the 22d of the same month the complainants were elected elders and deacons.

The congregation was part of the Watson Run charge; Rev. Frederick Wahl was installed pastor over the two congregations in May 1869, and preached to the Greenwood congregation on three Sundays, the last being on the 5th of September 1869, since when the defendants took possession of the church and hold it against the plaintiffs.

The master decided "that this church is a member of the German Reformed Church of the United States and of St. Paul's Classis, and subject to the ecclesiastical jurisdiction of said classis. This congregation became divided in 1868; the division originated in the selection of Rev. Robert Koehler as minister or pastor of the church. The plaintiffs claimed that Rev. Koehler was unfit for the place assigned him, and made complaint against him to the defendants, the elders and deacons of the church, who had been elected January 1st 1868, charging Koehler with immoral conduct, and demanding an investigation of the charge. This demand not being complied with, St. Paul's Classis, on complaint made to them, instituted the inquiry, and sitting as an ecclesiastical court, decided and so recorded on their minutes, at their annual meeting held at Brady's Bend, Penna.; January 7th 1869, that said classis have ecclesiastical jurisdiction of this church, and declared the offices held by the defendants vacant. This decision is binding upon our courts. * * *

" As to the title of the property and the right to its use, which seems to be the important point in dispute between these parties, I can come to no other conclusion than that it belongs to the German Reformed congregation of Greenwood township (now Union township), to those who approve of the doctrines professed and the forms of worship in practice in the government of the church with which it was connected at the time the trust was declared, and is so whether they be a minority or majority of the congregation."

After exceptions by the defendants, the court (Vincent, J.) confirmed the report, and decreed:—

" That the ownership and control of said property and house of worship is in the complainants as trustees thereof and in the congregation which they represent, and that possession thereof be delivered to them as such trustees and representatives, and that respondents be perpetually enjoined from interfering therewith in any other mode or manner than that permitted by the rules, regu-

[Roshi's Appeal.]

lations and discipline of the German Reformed Church of the United States."

The defendants appealed to the Supreme Court, and assigned the decree for error.

*C. R. Marsh* and *Douglass & McCoy*, for appellants.—It is not an implied condition of the grant, in trust for the use of the German Reformed Church and congregation of Greenwood, that the church shall remain connected with any particular church judicatory : Presbyterian Congregation *v.* Johnston, 1 W. & S. 9 ; Lutheran Congregation of Pine Hill *v.* St. Michael's Evangelical Church, 12 Wright 20. The appellees had a remedy at law, and a court of equity will not interfere : Gallagher *v.* The Fayette Railroad Company, 2 Id. 102 ; Updegraff *v.* Crans, 11 Id. 103 ; Patterson *v.* Lane, 11 Casey 275 ; Rife *v.* Geyer, 9 P. Smith 393 ; Phipps *v.* Jones, 8 Harris 260.

*C. M. Brush* and *S. M. Pettis*, for appellants, cited Kisor's Appeal, 12 P. F. Smith 428 ; Gump's Appeal, 15 Id. 476 ; Schnorr's Appeal, 17 Id. 138.　.

The opinion of the court was delivered, October 30th 1871, by

SHARSWOOD, J.—The question whether, under the equity powers conferred by the Act of Assembly of June 16th 1836, upon the Courts of Common Pleas, those courts have jurisdiction of such a cause of complaint as is set forth in the bill in this case, has been considered and settled by this court in Kisor's Appeal, 12 P. F. Smith 428. It had often before been assumed and exercised without dispute, and with the implied recognition of this court. If a private partnership or a corporation falls into confusion affecting all its members, there is no adequate remedy at law —no better remedy than a proceeding in equity to settle the rights of the parties and to stay by injunction the inconvenience and disturbance caused by opposite factions pretending to act as the society : Kerr *v.* Trego, 11 Wright 295. "It is the very remedy," said Chief Justice Lowrie, "usually adopted when churches divide into parties, and we applied it in three such cases in the last year. Therein we decided directly on the rights of property, because that became the aim." Indeed, a religious society, incorporated or unincorporated, is but the trustee of a charity, and it has always been peculiarly within the province and duty of a court of equity to prevent the diversion of property, held in trust for such purposes, from the object and design of the original endowment. Hence, it is not merely because the courts of Common Pleas are invested with the jurisdiction and powers of a court of chancery, so far as relates to "the supervision and control of unincorporated societies," as well as corporations, but

also as to "the control of trusts," and "the care of trust property," that the jurisdiction of the court below in this case must now be considered as beyond all question.

The principle which governs in all such cases is old and well-settled, and has been frequently asserted by this court. Whenever a church or religious society has been originally endowed in connection with, or subordination to, some ecclesiastical organization and form of church government, it can no more unite with some other organization, or become independent, than it can renounce its faith or doctrine, and adopt others. Indeed, in many churches, its ecclesiasticism or form of church government is an important if not a fundamental point of doctrine. It is based, in their view, upon a scriptural model or teaching. Thus government by diocesan bishops, and the three orders of the ministry —bishops, priests and deacons—is part of the doctrine as well as the order of the Established Church of England, and her daughter, the Episcopal Church of this country. On the other hand, the Established Church of Scotland, and, for the most part, the reformed churches of the continent of Europe, and all those who have derived their succession from them, hold to the doctrine of the perfect parity of ministers, and government by Presbyteries or Classes and Synods. "I approve," said Mr. Justice Burnside, in App v. Lutheran Congregation, 6 Barr 201, "of the doctrine of Lord Eldon, in the case of the Attorney-General v. Pearson, 3 Meriv. 400, that it is the duty of the court to decide in favor of those, whether a minority or majority of the congregation, who are adhering to the doctrine professed by the congregation, and the form of worship in practice, as also in favor of the government of the church in operation, with which it was connected at the time the trust was declared:" McGinnis v. Watson, 5 Wright 9; Sutter v. The Trustees of the First Reformed Dutch Church, 6 Id. 503. " The title to the church property of a divided congregation is in that part of it which is acting in harmony with its own law, and the ecclesiastical laws, usages, customs and principles which were accepted among them before the dispute began, are the standard for determining which party is right:" Id.

There is no difficulty in the application of this principle to the facts of this case as reported by the master, and in which we think, with the court below, that he was fully sustained by the evidence before him. The church now the subject of controversy, was organized in 1835 by the Rev. Philip Zaiser, a minister of the German Reformed Church of the United States, acting by the authority of the synod of that church. His action was reported to the synod, and approved by that body. The church was formally accepted as one of its constituent members. In 1836 the lot upon which the present church building now stands was conveyed by Thomas Astley to Peter Stein, Philip Huber

and John Roberts, " trustees of the German Reformed Church,"
" in trust for the use of the said German Reformed Church." The
German Reformed Church of the United States was at that time a
distinct ecclesiastical organization, not merely having adopted the
Heidelburg Catechism as the confession of its faith, but having a
written constitution, a settled form of government by ecclesias-
tical judicatories, four in number, in regular gradation, from the
lowest to the highest, having cognisance of ecclesiastical matters,
though their power of course was wholly spiritual. First, the
Consistory, the primary governing body of each church or con-
gregation, composed of the minister or ministers of that church,
together with the elders and deacons as the representatives of the
people. Second, the Classis, consisting of all the ministers and
delegated elders of the congregations within a certain designated
territorial district. Third, a Synod, consisting of the ministers
and lay delegates of the several classes embraced within its pre-
scribed geographical limits. And, fourth, the General Synod, the
highest judicatory of the church, and the court of last resort,
composed of ministerial and lay delegates elected by all the classes
respectively, according to a prescribed ratio of representation. By
organizing as a German Reformed Church, the society in ques-
tion, *ex vi termini*, agreed to submit its spiritual regulation to this
constitution and form of government. It agreed, especially, that
the classis within whose bounds it should happen to be should de-
cide all cases " respecting either ministers or congregations which
may arise within their jurisdiction:" Const. of German Reformed
Church, Art. 51; and " that before a call is accepted by a preacher
it shall be submitted to synod or classis:" Id., Art. 52. They
could settle no preacher as their minister except with the appro-
bation of the classis or synod to whose jurisdiction they were
subject. If, therefore, in 1854, this congregation did adopt for
themselves a constitution, by which they attempted to become in-
dependent of all ecclesiastical authority, it was *ultra vires*. They
might indeed, as individuals, have formed any kind of church they
pleased, independent or connected with any other ecclesiastical
organization. The land was before them, but then they must
cease to be a German Reformed Church, and abandon all claim
of right to hold any of the property of that church. It was a
part of their religious liberty, guaranteed to them by the Consti-
tution of the Commonwealth, to separate from their former asso-
ciation, if they became dissatisfied with its faith or order, and
build for themselves another church and organize on other princi-
ples; but it was no part of that liberty to appropriate to them-
selves, in their new capacity, property which had been solemnly
consecrated to other uses. But in fact the constitution of 1854
did not pretend to throw off allegiance to the judicatories of the
church, though some of its provisions may have been inconsistent

with the general constitution.   After its adoption for many years
—up to the period when this controversy arose—it continued to
be served by ministers of the German Reformed Church approved
by the classis.   It was represented by an elder from time to time
in that body.   The classis to which it was attached held a meet-
ing or meetings within its walls.   It made contributions in money
to defray the expenses of the classis.   Its minister's salary was
on one occasion supplemented from the general missionary funds
of the church ; and in 1863, on the occasion of the third centen-
nial anniversary of the foundation of the German Reformed
Church, it held a religious festival in common with all its sister
churches of the same communion.   In view of these, and many
other facts of tne same nature, disclosed by the testimony, it
ought not now to be denied that the church in question was and
continued to be a German Reformed Church, subject to the spirit-
ual jurisdiction of the proper judicatories of that church.

The dispute which has given rise to this proceeding began with
a certain portion, we may admit a majority, of the congregation
undertaking to call and settle a minister, without having his call
submitted to and approved by the classis or synod.   That it was
entirely within the scope of the proper jurisdiction of the classis of
St. Paul, within whose bounds this church is situated, to institute
an investigation and act upon its own motion in such circum-
stances, is abundantly clear.   By art. 51 of the constitution the
classis are to take " cognisance of whatever concerns the welfare
of the congregation committed to their care, and which does not
come within the power of a consistory."   When the consistory of
a particular congregation undertakes to declare itself independent
of the classis, and to act in defiance of the general and funda-
mental law of the church, it is not only the right but the duty of
the classis to declare that they no longer hold the offices to which
they were elected, and to provide for the election of another con-
sistory by those who still adhere to the order and discipline of the
church.   It is an emergency which can be met and provided for
in no other way.   Nor have the defendants in this bill any right
to take exception to the regularity of the proceeding, or to com-
plain that they had no notice, and were condemned unheard.
They disclaimed the jurisdiction of the classis.   In their answer
to this bill they continue to disclaim it.   They utterly deny that
this church has ever been a member of or connected with the
classis or synod of the German Reformed Church.   They dis-
tinctly admit the charge of the bill that the respondents do aver
and declare themselves " to be an independent body and not sub-
ject to the ecclesiastical jurisdiction of St. Paul's Classis, the
synod of the German Reformed Church, or any other ecclesiasti-
cal body."   By their own act they are strangers and aliens, and
had no right to notice of any proceedings affecting the church.

[Roshi's Appeal.]

The whole case is then reduced to this one simple question, whether being such an independent body as they declare themselves to be, they have any right or title to the lot, with the building thereon erected, which as we have seen was conveyed "in trust for the German Reformed Church," and can withhold the possession and enjoyment of it from those who, under the orders of the proper judicatory, have been chosen to represent that portion of the congregation who adhere to the faith, order, government and discipline of their church.   To this question there can be but one answer in law, equity, good conscience, justice as well to the living as the dead, and according to the precepts of that Divine master who has taught us to do unto others as we would that others should do unto us.

Decree affirmed and appeal dismissed at the cost of the appellants.