First Regular Baptist Church *v.* Allison
(et al., Appellants).

Argued March 24, 1931. Before FRAZER, C. J., WALL-
ING, SIMPSON, KEPHART, SCHAFFER and MAXEY, JJ.

*W. M. Ruddock*, with him *Harry W. Fee*, of *Fee &
Tomb*, for appellants.—The decree of the lower court
overruling preliminary objections to the bill was error;
the objection was a serious one and raises the question
of the court's jurisdiction of this action: Dayton v.
Carter, 206 Pa. 491; Hartley v. Langkamp, 243 Pa. 550;
Monessen Boro. v. Water Co., 243 Pa. 53; Bedford
Springs Co. v. McMeen, 161 Pa. 639.

Jurisdiction of the subject-matter cannot be conferred
by estoppel: Wettengel v. Robinson, 288 Pa. 362.

Each Baptist church, as that denomination is consti-
tuted, is within itself a pure democracy; to the ex-
pressed will of the majority of which it is the duty of
the minority to submit: Monongahela City Baptist
Church v. Shawger, 36 Pa. C. C. R. 514.

The law covering cases of this type is well settled in
this state: Nagle v. Miller, 275 Pa. 157; McGinnis v.
Watson, 41 Pa. 9.

Plaintiffs' case must fail unless it can show that de-
fendants, by their withdrawal from the above named
voluntary associations of Baptist Churches and their
joining of other named voluntary associations of Bap-
tist Churches, made such a change as would amount to
a radical departure from their articles of faith and or-

iginal doctrines: Schnorr's App., 67 Pa. 138; McGinnis v. Watson, 41 Pa. 9; Lutheran Congregation of Pine Hill, 48 Pa. 20; Com. v. Stauffer, 289 Pa. 139.

*James W. Mack,* with him *E. E. Creps* and *Merritt H. Davis,* for appellee.—All objections as to jurisdiction must be deemed finally waived by defendants: Summerhill Boro. v. Sherbine, 88 Pa. Superior Ct. 419; Wright v. Barber, 270 Pa. 186; Bank of Pittsburgh v. Purcell, 286 Pa. 114; Magen v. Neiman, 301 Pa. 164; Strizak v. Danacko, 11 Pa. D. & C. 150.

It appearing there was no decision on the preliminary objections to the bill, there is nothing in the record upon which to base any assignments of error on the question of jurisdiction: Glassport Trust Co. v. Feightner, 300 Pa. 317; Van Sciver v. Hotel, 298 Pa. 463; Land T. & T. Co. v. Fulmer, 24 Pa. Superior Ct. 260.

Defendants have admitted the jurisdiction of equity in this case and submitted themselves thereto: Roshi's App., 69 Pa. 462.

The findings of fact by a chancellor have the force and effect of a verdict of a jury, and will not be disturbed if there is evidence to support them: Duffey v. Jennings, 247 Pa. 388, 391; Clothier v. Hoffman Co., 261 Pa. 83, 87; MacDougall v. Bank, 265 Pa. 170, 175; Scranton v. Coal Co., 256 Pa. 322, 327; Beaver v. Slane, 271 Pa. 317, 321; Glenn v. Trees, 276 Pa. 165, 167.

OPINION BY MR JUSTICE SIMPSON, May 11, 1931:

This controversy is over the control of the property of the First Regular Baptist Church of Indiana, Pennsylvania, hereinafter called the Indiana church. We have painstakingly read and carefully considered the 1041 pages of the record and supplemental record and the 210 pages of the briefs, and, despite the 90 assignments of error, find that the questions to be determined by us are relatively few in number, and not nearly so difficult as the quantity of printed matter would seem to imply.

Defendants, who are appellants here, contend that since a Baptist church is of the congregational and not of the federated type, and there is no church judicatory to which property disputes in a particular congregation can be referred, they, as the majority of the membership, have the right to decide all matters which relate to the Indiana church property, and the other faction, being in the minority, must submit to that which has been so decided. This statement would be too broad even in the case of an unincorporated congregation. It is undoubtedly true, as contended by appellants, that "each particular and individual [Baptist] church is actually and absolutely independent in the exercise of all its churchly rights, privileges and prerogatives"; but it is only when it is exercising its "churchly rights, privileges and prerogatives," that the action of the majority of the congregation is controlling. If it attempts to pass that barrier, and to do that which is essentially nonbaptistic, it subjects itself, so far as property rights are concerned, to the supervision and control of a court of equity: Nagle v. Miller, 275 Pa. 157. Indeed, appellants admit this, when they state their contention to be that the individual churches "can change their former usages and practices at any time, so long as they do not depart from the religious principles, beliefs and forms of worship of the church." It follows that the majority of the members of an unincorporated Baptist church cannot make changes which result in such a departure, if thereby property rights are affected.

Where, however, there is a trust specifically declared in the deed of the property, which is the subject of the litigation, or where there is a charter for the church which owns that property, the rights of the respective parties are to be determined by a consideration of the deed or charter, and no majority, however great, can affect or destroy those rights by any act which is antagonistic to the deed or charter; and this is so, no matter what the rights of the parties would otherwise have

been. In the present case we have both a deed and a charter.

The deed, which was executed before the Indiana church was incorporated, conveys the land upon which the church is built, to "Lewis E. Freet and William Row, their heirs and assigns, in trust and confidence nevertheless to and for the sole and separate use, benefit and behoof of the members of the regular Baptist church and congregation as at present constituted in the village of West Indiana, Indiana County, Pennsylvania, and their successors in membership, while they adhere and hold to the belief, religious principles, doctrines and articles of faith as contained and set forth in the confession of faith of said church." Under this limitation, appellants, though a majority of the members of the Indiana church, cannot legally divert the property to the "use, benefit and behoof" of those who do not "adhere and hold to the belief, religious principles, doctrines and articles of faith as contained and set forth in the confession of faith of said church," and those who do adhere thereto, however small in number, may invoke the aid of equity to prevent its wrongful diversion.

The petition for the Indiana church charter recites the existing voluntary organization of the congregation and the erection of the church building, which they "have set apart and dedicated......to and for the public worship of Almighty God according to and in compliance with the faith, practice and discipline of the regular Baptist Church of the United States of North America, and are desirous of being incorporated in order to enjoy the powers and immunities of a body politic in law ......[and hence have] associated ourselves for the purpose aforesaid." The decree granting the charter states that "the subscribers thereto and their associates and successors shall be a corporation for the purposes and upon the terms therein stated, under the name and style of the First Baptist Church of Indiana, Indiana Co., Pa." Under this charter, no majority of the congrega-

tion, however great, will be allowed to divert the church property "to and for [any other use than] the public worship of Almighty God according to and in compliance with the faith, practice and discipline of the regular Baptist Church of the United States of North America," and those who adhere to that use, however small in number, may invoke the aid of equity to prevent its wrongful diversion.

Our first question is, therefore, Are the defendants attempting to divert the use of the property to those who do not "adhere and hold to the belief, religious principles, doctrines and articles of faith as contained and set forth in the confession of faith of said church," or who are in antagonism to "the faith, practice and discipline of the regular Baptist Church of the United States of North America"? On this point, each side called as witnesses some of their number and several distinguished divines, the testimony of the two classes being "equally positive and mutually irreconcilable." Those produced by appellee were certain that defendants and their associates did not adhere to the faith, practice and discipline specified in the deed and charter. Those called by appellants asserted that, while changes had been made, they did not in substance alter the previous status, but gave no valid reason why, if this be so, any change was made. Some of them said the changes were made to put teeth into the confession of faith. This way of stating the effect of the changes may be more un-Christlike in sound than in intention, but it certainly denotes a stress put upon the disagreeing members far beyond the independence of thought and action which defendants have consistently and strenuously urged is the inviolable possession of every Baptist, and which, they contend, justifies the changes which they, as the majority of the congregation, have made.

Moreover we cannot lose sight of the fact that the deed and charter do not protect the beneficiaries from great changes only, but also from those which will divert the

property from the uses to which it was devoted. This does not mean unsubstantial ones, but the question of their substantiality does not depend on the views of those who are attempting to make the changes, but upon whether or not those who adhere to the old ways have a reasonable right to object to the changes. We cannot say the objections here made are unreasonable. Nor can we forget that in the past repeated, insidious, small changes have so accumulated, in the course of time, as to result ultimately in a tremendous variance,—in the religious realm, perhaps more so than in any other.

The chancellor believed the witnesses called on behalf of appellee, and found that the changes made by appellants were substantial, and not merely in methods of expression. In this he was sustained by the court in banc. We have studiously read the evidence on which each and all the findings of fact were predicated, and cannot say it conclusively appears that any was erroneous. This being so, we must sustain these findings: More v. People's Bank & Trust Co., 297 Pa. 252, 259; Bishoff v. Valley Dairy Co., 302 Pa. 125, 130; Levy v. American Ice Co., 303 Pa. 64.

Nothing would be gained by attempting to epitomize the 79 findings of fact of the court below, or even to review the evidence upon a consideration of which it reached its conclusion that there were such substantial changes made by defendants; but the picture may be briefly limned. From 1858, when the Indiana church was organized, until 1923, the members thereof lived in harmony, without, so far as appears, any serious differences between them. This seems to have been true, also, as to the Baptist denomination generally, though it is claimed that for some time there had been a strong undercurrent of dissension, the line of cleavage being, as alleged by defendants, the differences between fundamentalism and modernism. In 1923, as in previous years, delegates were elected to the Northern Baptist Convention, an organization through which some of the

work of the denomination was performed. That body was merely a representative one, and had adopted no confession of faith. Apparently believing that the time was ripe for a determination of the smouldering issue above referred to, a resolution was offered which was intended to pledge the delegates to what is known as the New Hampshire confession of faith, which was in effect, if not in terms, the confession of faith of the Indiana church. A substitute was offered which stated that "The Northern Baptist Convention affirms that the New Testament is the all-sufficient ground of our faith and practice, and we need no other statement." The substitute was adopted by a vote of 1264 to 637, and, from then on, there has been a serious division between the two groups of Baptists, both in and out of the Indiana church, though those who agree with defendants are but a small percentage of the Baptists of the country. The pastor of the Indiana church adhered to the views of the minority of those voting in the convention, and ultimately had with him a large number of his parishioners. As it had a right to do, the Indiana church withdrew from its affiliation with the previously existing church agencies, and formed others in antagonism thereto, though working along the same lines.

The defendants and those associated with them in the Indiana church appear to have then determined to impose their will on the rest of the membership, though they knew this was contrary to the customs and principles of the Baptist Church. For the purpose, as they said, of cleansing the Indiana church, they adopted new and stricter by-laws, and proceeded to get rid of all disagreeing members. In a short time they struck from the roll the names of nearly or quite half the active members, without giving them any hearing whatever, some because they dared to meet to consider what should be done in view of the dissensions which had arisen, and others because they would not sign a covenant which defendants submitted to them, this being a requirement never there-

tofore made, and which was wholly foreign to the customs of the Baptist Church. Defendants, or many of them, agreed to be bound by a new confession of faith, different from that in existence when the Indiana church was organized, and when the deed to the property was executed and delivered, and when the charter was obtained. The new confession of faith says, among other things: "We believe that Jesus Christ was begotten of the Holy Ghost in a miraculous manner; born of Mary, a virgin, as no other man was ever born or can be born of woman, and that He is both the Son of God, and God, the Son." Passing by the immaterial verbal changes attempted to be effected thereby, there still remains the statement that Christ was born in such a way "as no other man......can ever be born of woman." It may be that defendants did not mean by that statement to assert that God, whose power is infinite and illimitable, cannot again do what He once did; but the language expresses that meaning, and was the cause of great offense to those who adhered to the old and theretofore approved doctrine of the virgin birth.

In the main, the facts as stated above were not disputed, but the alleged wrongful purpose of defendants was denied, and excuses, satisfactory to defendants themselves but not to the court below, were made for all that was done by them. Since these and the other findings of the chancellor were approved by that court and have ample evidence to sustain them, they must be and are accepted by us.

Our conclusion, as above stated, is determinative of the important questions involved, for the court below but did what we declared was its duty to do under such circumstances, namely "to administer the trust in such manner as best to establish the usage [of the church], considering it a matter of implied contract with the congregation": Greek Catholic Church v. Orthodox Greek Church, 195 Pa. 425. Defendants had an inalienable right to disagree with the uses set forth in the deed and

charter, and with the beliefs of those who agree therewith, but this did not give them the further right to retain possession of the property devoted to those uses; all they could properly do was to depart therefrom, form another alliance and erect a new church, dedicated to their own beliefs: Schnorr's App., 67 Pa. 138; Roshi's App., 69 Pa. 462; Greek Catholic Church v. Orthodox Greek Church, supra. We must, therefore, affirm the decree, unless there are some procedural errors which vitiate it. We do not find any such.

At an early stage, the defendants who appeared to the action made preliminary objections to the bill (1) "because plaintiff had an adequate remedy at law," and (2) "because the bill is defective for want of specifically named parties plaintiff." No steps having been taken by them to have these questions preliminarily decided, appellee, some six weeks later, petitioned to have the bill taken pro confesso; upon consideration whereof, the court below directed defendants to file an answer on the merits, under penalty of having the bill so taken. They did not appeal from this order, but answered generally, followed by an averment of new matter, concluding with prayers for affirmative relief, inter alia, that the court should decide that defendants were "the proper officers and members of the [church] and lawfully in possession of the church buildings and grounds." To this new matter a replication was filed, and the case was tried on the issues raised by the bill and answer, and by the new matter and the replication. In their statement of the questions involved on this appeal the two preliminary objections above specified are not referred to, and hence need not be considered by us: New York & Penna. Co. v. New York Central R. R. Co., 300 Pa. 242. The individual appellant, D. R. Walkinshaw, does thus refer to the alleged lack of jurisdiction in equity, but as he denies that the counsel who made the objection ever acted for him, he has no standing to assign as error the action of the court below on the subject. Moreover,

equity has jurisdiction in this class of cases, (section 13, Act 16th June, 1836, P. L. 784, 789), and, in view of defendants' foregoing prayer for relief, those who appeared by counsel could no longer challenge that jurisdiction, since the court below did exactly what they asked it to do, viz., decide the controversy between the parties; and the individual appellant, if he desired to have the benefit of their objection,—not having himself made one,— could only do so cum onere, that is, subject to be defeated on any ground which would defeat them.

The individual appellant raises three other points: (1) that no decree should have been entered against him because he was not served with the bill, and did not appear to the action; (2) that since his four minor children were members of the church, but were not named as defendants, the decree was entirely wrong; and, (3) the decree was erroneous because the actions of defendants cannot properly be made the subject of review by any court. The record in the case is barren of anything showing the children were members of the church, and they cannot be brought in by the affidavit of their father on this appeal, which affidavit, as he admits, is "not in evidence." Moreover, they have taken no appeal, that by their father being in his personal behalf. The third point has been decided in reviewing the other appeal, and what is there said need not be repeated here.

Considering the first point, it appears from the final decree that this individual appellant is specifically named therein, that the injunction ordered goes against him as well as the others named, and that he and they are together directed to pay the costs. If he had been served with process, or had appeared to the action, the decree as entered would be correct, but neither of those things occurred, unless his testifying at the trial operates as the entry of an appearance. This, however, is not so. We have repeatedly said that a witness is not bound by any of the proceedings in the case wherein he testifies: Siegfried v. Boyd, 237 Pa. 55; Stonecipher v.

Keane, 268 Pa. 540. We conclude therefore, that he should not have been named in the decree. We shall only allow him the record costs on his appeal, however, because the printing done by him nearly all relates to the third question above, which we have decided against his contention.

The decree of the court below is modified by striking the name of D. R. Walkinshaw therefrom, and, as thus modified, it is affirmed and the appeals are dismissed; appellee is directed to pay the record costs on the appeal of D. R. Walkinshaw, and Mrs. E. Wilson Bagley, and those who appealed with her, are directed to pay all the costs on their appeal.