ASHMAN ET AL. *v.* STUDEBAKER ET AL.

[No. 17,243. Filed October 6, 1944.]

*Russel J. Wildman,* of Peru, and *Walter R. Arnold,* of South Bend, for appellants.

*Hurd J. Hurst* and *Albert H. Cole,* both of Peru, for appellees.

CRUMPACKER, J.—This action has its roots in a theological dispute between the leaders of Brethren theology in the United States which culminated in 1939 in a definite schism in the church. As this doctrinal controversy developed, it filtered down to individual churches of the Brethren denomination, and in the First Brethren Church of Peru, Indiana, the property rights of the parties to this litigation became involved and thus we become vested with jurisdiction in a matter that otherwise would be none of our concern.

In the very beginning we wish it to be understood that what we say here is no attempt to adjudicate the right of any person to the religious beliefs and practices he chooses, nor are we seeking to determine the truth or falsity of the various religious doctrines we find it necessary to discuss.

These proceedings were instituted by certain of the appellees as members of the First Brethren Church of Peru for themselves and all others similarly situated. Also joined in the suit as parties plaintiff are certain others of the appellees as trustees of the Brethren Conference of Indiana and still others as trustees of the Missionary Board of the Brethren Church. The appellants are the trustees and officers of the governing board of said First Brethren Church of Peru and its pastor, all of whom are charged in the appellees' complaint with having perverted the use of the property of said local church to the promulgation of theological doctrines incompatible with the traditional tenets and beliefs of the Brethren Church as a state and national ecclesiastical organization. Said complaint seeks to impress all property of the Peru church with a trust for the use and benefit of the members of such local congregation who adhere to the "established tenets and doctrines of the Brethren Church and for the teaching and practice of said tenets and doctrines." It further asks that the appellant Ashman be removed as the pastor of the local church and that the appellees, for the use and benefit of said church, "be given immediate possession of the parsonage, and that the defendant trustees and members of the Official Board be permanently enjoined from employing any pastor who is not in sympathy with and who will not teach and practice the established doctrine of the Brethren Church, adopted, promulgated, proclaimed and taught." As this cause was commenced before the 1940 Rules became effective issues were joined by the complaint, as above summarized, and an answer in general denial. There was a trial to the court, a special finding of facts, conclusions of law favorable to the appellees, and a decree following very closely the prayer of the complaint

as above indicated. The only questions presented by the assignment of errors, and not waived, concern the sufficiency of the evidence to sustain the court's decision and the legality thereof.

Our approach to this question is governed, of course, by the well-known and settled rule in Indiana, even in equity cases, that where the evidence in respect to matters in controversy consists partly of oral testimony the evidence will not be weighed and only such evidence as is favorable to the decision can be considered, and if there is any evidence whatever which supports the decision in its essential particulars, such decision must stand regardless of any evidence to the contrary. *State Life Insurance Co.* v. *Cast* (1938), 214 Ind. 17, 13 N. E. (2d) 705; *Parkison* v. *Thompson* (1905), 164 Ind. 609, 73 N. E. 109; *Ringenberg* v. *Ringenberg* (1942), 110 Ind. App. 290, 38 N. E. (2d) 870. In cases of purely equitable cognizance the statute, § 2-3229, Burns' 1933, § 467 Baldwin's 1934, permits an assignment of error that the judgment is clearly against the weight of the evidence and thereby require courts of error to "carefully consider and weigh the evidence," but the above cases and many others hold that this statute has no application to conflicting oral testimony. *Hudelson* v. *Hudelson* (1905), 164 Ind. 694, 74 N. E. 504; *Ray* v. *Baker* (1905), 165 Ind. 74, 74 N. E. 619; *Hitt* v. *Carr* (1929), 201 Ind. 17, 162 N. E. 409. This is the rule even when the evidence is documentary if the force and effect thereof depends in part on oral testimony. *Glick* v. *Hunter* (1920), 190 Ind. 51, 129 N. E. 232.

The evidence most favorable to the decision herein tends to prove that in August, 1883, a faction of the German Baptist or Tunkers Church, calling themselves the "Progressive Brethren," incorporated, under the

laws of Ohio, a religious organization to be known as "The Brethren Church." Its articles of incorporation provided that: "The purpose for which this corporation is formed is to perpetuate and extend the Christian religion and the influence of the Gospel and to that end to promote the harmony, efficiency and progress of all local Brethren Churches in the United States without interfering with congregational control and government or seeking to set up or establish any creed but the New Testament. To further that purpose all members of Brethren Churches in the United States may become members of this corporation."

Thereafter many religious societies and churches, some of them newly organized and some formerly affiliated with the German Baptists or Tunkers, associated themselves together as a denomination known as the Brethren Church and organized a general conference made up of delegates from all such associating societies, groups, or local churches whose members desired to adhere to the Christian religion according to the tenets and beliefs for the teaching and promulgation of which said Brethren Church had been incorporated. This conference was held in Ashland, Ohio, in September, 1887, and in the course of its proceedings the following resolution was adopted: "It is the sense of this convention that the apostolic idea of congregational church government relates alone to the incidental affairs of the local congregation and not to doctrinal practices and tenets, which must be general or universal—the same in all congregations, the doctrinal conditions of membership in one congregation shall be the doctrinal conditions in each other." General conferences, similar to and made up as was that of 1887, have been held annually since 1892. In 1891 the Association of Brethren Churches of the State of Indiana was or-

ganized and a constitution adopted providing that the qualification for membership shall be a belief in the "teachings of Christ and His Apostles in letter and spirit as set forth in the New Testament Scriptures and universally practiced by the Brethren churches, among which are faith, repentance, trine immersion, laying on of hands, feet washing, the Lord's supper, communion, the holy kiss and anointing the sick." This association was incorporated as a non-profit corporation under the laws of the State of Indiana, and under its charter and constitution it created and has since maintained a board of trustees known as the Trustees of the Brethren Conference of Indiana, whose duties, among others, are to receive, hold and convey real estate and personal property used by Brethren churches in the State of Indiana. This Indiana conference was and is in all matters affiliated with the General Conference of the Brethren Church and regularly elects and sends its delegates thereto.

As another instrument for the furtherance of its work the Brethren Church, through its General Conference, incorporated under the laws of the State of Illinois "The Missionary Board of the Brethren Church" for the purpose of supervising the missionary work of the church, building new churches, and extending financial assistance to such existing churches as might be in need thereof.

The First Brethren Church of Peru was organized in April, 1914, to the end that its members might "worship according to, and that there might be taught in said city the religious faith and belief of the Brethren Church," as adopted, declared and promulgated by said Ohio corporation of that name through its said General Conference. From the time of its organization up to and including 1939, the Peru church maintained a close

association with both the General Conference and the conference of the Indiana churches as well as supporting in what way it could various subsidiary organizations of said conference such as the Missionary Board, the Brethren Evangelist and the Ashland Seminary, an institution devoted to the teaching and training of young men for the ministry.

In February, 1915, the Peru church purchased a building site and caused title thereto to vest in its local Board of Trustees. In the beginning a frame church was built on the site but this was razed in 1924 and a modern brick structure was erected at a cost of $39,755. At the time the building site was acquired there was a dwelling house on the south end thereof which was and still is used as a parsonage and which is now occupied by the appellant Ashman. In January, 1922, the entire property was deeded to the "State Conference Trustees" for the purpose of insuring its continued use in the teaching and promulgation of the doctrines and beliefs of the Brethren Church. This deed was not recorded and was later accidentally destroyed by fire.

Some 50 years ago Ashland College and Seminary was organized to teach the doctrines and tenets of the Brethren Church and prepare young men for its ministry. This church had no written creed except the "Bible, the whole Bible and nothing but the Bible," but in the application thereof to human life and conduct certain established and traditional tenets and beliefs had come to be recognized as characteristic of the denomination. Among these were the doctrine that baptism by trine immersion is a necessary condition to salvation and that the Sermon on the Mount, which contains the Beatitudes and the Lord's Prayer, prescribes the standards for present day Christian living.

Early in the 1930 decade Ashland Seminary and the Brethren Evangelist, the official publication of the church, were largely in control of a group of professors and other individuals who began teaching and spreading doctrines that were new and revolutionary to traditional Brethren tenets and beliefs. This group contends and preaches that baptism is not a prerequisite to salvation; that salvation comes through the grace of God alone and not through any particular means practiced by man to obtain it. They further teach what is called the doctrine of "eternal security," by which is meant that once one becomes a Christian or has been "regenerated" his future conduct, no matter what it may be, will not jeopardize his salvation. This group also contends that the Sermon on the Mount has no present day application, contains no gospel and prescribes no means of salvation but, on the contrary, is pertinent only to the millennium. As this theological controversy became acute, two of the leading advocates of the so-called "Grace" doctrine were dismissed from the faculty of the Ashland Seminary and, together with their followers, organized a rival institution known as Grace Theological Seminary now located at Winona Lake, Indiana. Rival general and district conferences and other organizations have also been set up by the Grace group, all of which have as their ends and purposes the promulgation of Grace doctrines in opposition to the established and historical tenets and beliefs of Brethren theology as taught in Ashland Seminary and preached in Brethren churches throughout the land.

In October, 1936, the members of the First Brethren Church of Peru, through their officers and trustees, feeling in need of financial assistance, made application for relief to the Missionary Board of the Brethren Church wherein they agreed to recognize and submit

to the control of said Board in all matters relating to the affairs of the local church and that the local pastor should be a direct employee of said Board. This application was accepted by the Missionary Board of the Brethren Church and pursuant thereto said Board paid sums of money each year to said Peru church for the purpose of enabling it to carry on its activities and reduce its indebtedness.

On May 28, 1937, the appellant Ashman applied for the position of pastor of the Peru church and was employed by the Missionary Board under the terms of a written contract wherein the said Ashman agreed to submit to the Board's judgment in all matters pertaining to the conduct of his work as pastor and resign at any time he was found, in the judgment of said Board, to be unfitted for such work, and that he would "faithfully teach the great fundamentals of the gospel of Christ and obedience to all its ordinances as believed and practiced by the Brethren Church."

Following his appointment as such pastor the appellant Ashman began a calculated effort to undermine and destroy the affiliation of the Peru church with the Brethren church and its general and state conferences and to ally it with the Grace group. He sought to reject and repudiate the established doctrines of the Brethren Church as theretofore practiced in the Peru church and substitute therefor the doctrines of the Grace group. This he sought to accomplish by private conversations with individual members of his congregation with such success that he induced a majority of the trustees of said church, a majority of its official board and 34 individual members of the congregation to renounce the established tenets of the Brethren Church and embrace the contrary doctrines of the Grace group. Under these circumstances

the Missionary Board requested the appellant Ashman to resign his pastorate which he refused to do and thereupon, at a meeting of the congregation of the Peru church, which many members thereof did not attend, it was voted that Ashman be retained as such pastor. There is a strong inference that, unless Ashman is removed as such pastor and the defendants enjoined from teaching and practicing the tenets and doctrines of the Grace group, the purposes for which the property of the Peru church was acquired will be frustrated and defeated and its use perverted to an end incompatible with the objection of its acquisition. It further appears that those members of the congregation supporting the appellant Ashman made no substantial contributions to the cost of the church edifice, and that such cost was almost entirely borne by those members who remained loyal to the original teachings of the Brethren Church and by contributions made by said Missionary Board.

When we bear in mind that the First Brethren Church of Peru was organized, as expressed in its constitution, "to form an organic part of the General Brethren Church of the United States, holding in common with local branches, the general creed adopted by the National Conference at Dayton, Ohio, January A. D. 1883, viz: 'The New Testament of our Lord and Savior, Jesus Christ,'" it seems clear that a trust came into existence when such church purchased real estate for church purposes and caused the title thereto to be vested in certain of its members as trustees. The Supreme Court of this State has said: "No principle is better settled than that property conveyed to trustees for the use of a church by its denominational name, as was the case here, creates a trust for the promulgation of the tenets and doctrines of that de-

nomination." *Smith* v. *Pedigo* (1896), 145 Ind. 361-416, 33 N. E. 777.

The appellants make a point of the fact that the trustees to whom the real estate was originally conveyed subsequently conveyed it to the trustees of the Brethren Conference of Indiana, whose title, they contend, is nominal only and who have no power of disposition or management, and therefore such subsequent deed is void as to the trustees named therein and title vested directly in the beneficiary. Sec. 56-609, Burns' 1943 Replacement, § 14746 Baldwin's 1934. We find no evidence in the record as to the contents of the deed in question further than as to the grantors, grantees and the real estate conveyed. This second deed was destroyed in an accidental fire, it was not recorded, no copy was put in evidence and there is no oral testimony as to its contents. It clearly appears that its purpose was to afford assurance that the property conveyed would be devoted to the promulgation of the Brethren faith and to assure a source of financial aid from the Missionary Board. From such evidence no inference flows that said deed created nothing more than a dry or naked trust, and we are therefore of the opinion that the statute upon which appellants' reply has no application.

We conclude, from briefs of counsel and their oral presentation of the question involved, that the appellants concede that the owners of the property in controversy are bound in law to devote its use to the teachings and practice of the Christian religion as sanctioned by the fundamental doctrines of the Brethren Church of the United States, that any perversion of such use may be enjoined, and that the conveyance of the real estate in question to the trustees

of the First Brethren Church of Peru created a trust
for the promulgation of the tenets and doctrines of the
Brethren Church as a distinctive religious sect or de-
nomination. Though they concede these principles of
law the appellants insist that the evidence wholly fails
to make a case for the appellees. In support of this
position they first contend that it affirmatively appears
without dispute that the only creed of the Brethren
Church of the United States is "the Bible, the whole
Bible and nothing but the Bible"; that the most the
evidence tends to prove is a mere difference of opinion
as to the proper interpretation of the text to the Bible
and that, when such interpretation is not governed or
pronounced by an ecclesiastical hierarchy, such differ-
ence of opinion cannot afford ground for appeal to a
civil court to wrest control of property from one group
and vest the same in another.

This contention is based primarily on the premise
that each Brethren congregation is an independent body
uncontrolled by a higher ecclesiastical authority and
that its form of government is congregational to the
extent that all matters pertaining to each individual
church are determined by the majority of its members;
that spiritually each church is bound by no creed but
the Bible, the interpretation of which is left to the minds
and consciences of such majority. We do not believe
the evidence justifies the conclusion that the Brethren
Church, and the organization plan through which it
functions, is democratic to that extent. While it is
true that, as a Christian denomination, it has stead-
fastly refused to adopt a written creed or sanction a dog-
matic set of written tenets, yet the men who brought it
into existence at Dayton, Ohio, in 1883, declared by
written resolution "that in doctrine the church of Christ
should universally harmonize, but on questions of gov-

ernment and customs may be congregational." Its second general conference in 1887 adopted the following resolution: "It is the sense of this convention that the apostolic idea of congregational church government relates alone to the incidental affairs of the local congregation and not to doctrinal practices and tenets which must be general or universal—the same in all congregations, the doctrinal conditions of membership in one congregation shall be the doctrinal conditions in every other."

Thus we think the power or right of the First Brethren Church of Peru to govern itself through a majority of its members is derivative and the source of such derivation must necessarily limit such power. The evidence conclusively indicates that congregational government in the Brethren Church has its origin and source in the pronouncements of its founders as set out in the above resolutions. This basic declaration of governmental policy has never been changed or modified and it plainly requires that doctrinal practices and tenets must be general and universal in all Brethren churches. This being true the power of local self-government gives to no individual congregation the power to change those beliefs and covenants which fix its character and justify its designation as a Brethren church. This principle is aptly expressed in the following excerpt from *Mt. Zion Baptist Church* v. *Whitmore* (1891), 83 Iowa 138, 49 N. W. 81, 13 L. R. A. 198: "If perchance a bare majority of some Baptist church should determine, on scriptural authority, their right to a plurality of wives, and, against the protests of a minority, devote the property of the church to the advocacy and practice of such a doctrine, under the claim of the appellees that the church 'owes no allegiance to any man or body of men, civil or ecclesias-

tical, except a majority of its members,' the only redress of the minority would be to retire from the church and leave the property to the majority for such purpose. Such a surrender of civil rights is without support on any principle of natural justice and we believe without the sanction of any judicial tribunal."

Thus the controlling question involved in this phase of the present case is narrowed to an inquiry as to whether the evidence discloses such a departure from those established and traditional doctrines and professions of faith, characterizing the Brethren denomination of churches, as amounts to a diversion of property from the trust purposes for which it is held and must be used. We realize that "nice distinctions or shades of opinion on doctrinal points or practice do not merit the interference of a court of equity," and we have approached the question before us with that admonition in mind. The appellant Ashman, pastor of the Peru church, testified that he believed in and preached the doctrines of the Grace group. There is evidence that as a result of his teachings and proselyting a majority of the members of the congregation believes as he does and are using the church property in promulgation of such doctrines.

A traditional tenet of the Brethren Church is that baptism by water is essential to salvation. Such baptism shall be by trine immersion, that is to say, one immersion each in the name of the Father, the Son and the Holy Ghost. This belief has its origin in the fifth verse of chapter three of the Gospel of St. John which says, "Except a man be born of water and of the Spirit, he cannot enter the kingdom of God." The phrase "born of water" is accepted as a figurative expression for baptism and therefore without

baptism a man's soul cannot be saved. The Grace group "believe in salvation by grace through faith"; that salvation is the "free gift of God, neither merited nor secured, in part or in whole by any virtue or work of man, but received only by personal faith in the Lord Jesus Christ in whom all true believers have as a present possession the gift of eternal life." The language just quoted we have taken from the profession of faith contained in the articles of incorporation of Grace Theological Seminary. Thus we have a phase of the age-old controversy between the "means" and the "anti-means" doctrines of salvation. See Tyler's Ecclesiastical Law, §§ 830 and 831. Those Brethren holding to the traditional doctrines of the church believe baptism to be a necessary "means" of salvation while the Grace group discard, as unnecessary, any medium of salvation provided by "means" of man and hold to the belief that it comes only by the grace of God through personal faith in Jesus Christ. In this respect the Grace group is Calvinistic in its teaching while the original church remains Arminian. As was said in *Smith* v. *Pedigo, supra,* "These two doctrines, in the light of historical facts, of which courts take notice, are recognized as in irreconcilable conflict . . . ." We also find ample evidence in the record that prior to the decade from 1930 to 1940 the doctrine of "eternal security" was not taught or preached in Brethren churches. The traditional doctrine of the church regarded regeneration through baptism as an ephemeral state that could be jeopardized and lost through subsequent unchristian conduct; that if a man believes and is baptized in the name of the Father, Son and Holy Ghost but goes forth to sin again he is no longer saved; that eternal salvation comes only through the preservation of baptismal regeneration throughout one's mortal life. No

tenet or belief could be more dogmatically opposed to such doctrine than a theology that teaches "eternal security" after one is once regenerated by "grace through faith" regardless of future conduct. Equally incompatible with long accepted Brethren theology is the rejection by the Grace group of the Sermon on the Mount as an active and living pronouncement of gospel applicable to present day life and its characterization, by that group, as a mere discourse on righteousness as it will exist in the millennium. It is no concern of ours, and we are not to be understood as making any effort to decide, which of these conflicting and incompatible doctrines is the true interpretation of the scriptural texts upon which they rest. We go no further than to say that the evidence in this case tends to prove that when the First Brethren Church of Peru was founded and the property involved. in this law suit was acquired, said church was dedicated to the practice and promulga- tion of a certain theology, which true or false, had long been recognized as characteristic of Brethren churches generally and that the appellants in the manner above indicated, have appropriated such property to a use inconsistent therewith. In one of the early cases on the subject it was said "The title to the church prop- erty of a divided congregation is in that part of it which is acting in harmony with its own law; and the ecclesiastical laws, usages and principles which were accepted among them before the dispute began are the standard for determining which party is right." Roshi's Appeal (1871), 69 Pa. 462. This principle also an- nounced years ago, is still accepted as a guiding rule, "It is the duty of the court to decide in favor of those, whether a minority or a majority of the congregation, who are adhering to the doctrine professed by the con- gregation, and the form of worship in practice, as also

in favor of the government of the church in operation, with which it was connected at the time the trust was declared." *App* v. *Lutheran Congregation* (1847), 6 Pa. 201. In our own State and of comparatively recent date the case of *Smith* v. *Pedigo, supra,* is to the same effect and to us seems squarely in point and decisive of this phase of the present controversy. It cites many cases and thoroughly discusses the tenability of a position almost identical with that taken by the appellants here. We regard it as decisive and controlling in the determination of this case and therefore are constrained to conclude that the decision of the court, so far as it pertains to the perversion of the trust involved, is sustained by the evidence and is not contrary to law.

This being an equity case it is necessary and proper that we consider where and with whom the equities lie. There is much evidence in support of the contention that the church in question was built and largely paid for by members of the congregation long before the controversy caused by the Grace theology developed; that those who paid for the building had never heard, up to that time, of the Grace doctrines and they refused to accept them after they were brought into the church by the appellant Ashman. The Grace faction was largely recruited after Ashman became its pastor and contributed no substantial amount to the cost of the church edifice. A like factual situation was dealt with by the Supreme Court of this State when it quoted with approval the following language: "It was manifestly unjust to allow persons becoming members of a religious society formed for the purpose of inculcating particular views, by their subsequent votes, to appropriate the property they might have done nothing to acquire to the promotion of views of an entirely

different character from those entertained by the persons through whose contributions the property may have been obtained." *Smith* v. *Pedigo, supra,* 400.

What legal significance should be attached to the contracts set out in the finding of facts, neither of the parties, by brief or oral argument, have particularly emphasized. The appellants say little argument need be devoted to them because the court's decree gave them no recognition nor did they affect such decree in any way. The appellees contend that they evidence, both on the part of the appellant Ashman and the congregation, the free and voluntary assumption of the obligation which the law enjoins upon both to adhere to the traditional faith of the Brethren denomination as the same was recognized and practiced at the time the church property was acquired and dedicated thereto. Accepting the contentions of both parties, it is apparent that these contracts in no way harmed the appellants and add little strength to the appellees' case. In our opinion the most that can be said for them is that they strengthen the appellees' equities and justify the joining of the trustees of the Missionary Board and the trustees of the Brethren Conference of Indiana as parties plaintiff.

The appellants insist, however, that, even though the contracts under consideration are valid and binding documents, the said trustees of the Missionary Board and the trustees of the Brethren Conference of Indiana were improperly joined as parties plaintiff in a single paragraph of complaint because their interests are not joint in that they spring from separate and distinct written instruments and the rights of all other plaintiffs have their source in matters of equity cognizance independent of contract. In 30 C. J. S. Equity, § 151, the rule is expressed thus:

"Where one general right is claimed, and there is one common interest among all the plaintiffs in the subject of the suit, and the same relief is sought against the defendants, their joinder is proper, although there is no privity or connection between them. It is not essential that the demands of the plaintiffs should be joint; it is sufficient if they are all interested, although distinctly, in the subject matter and the object to be obtained."

*Commodores Point Terminal Co.* v. *Hudnall* (1922), 283 F. 150; *The First National Bank of Mt. Vernon* v. *Sarlls* (1891), 129 Ind. 201; 28 N. E. 434; *The Town of Sullivan* v. *Phillips* (1886), 110 Ind. 320, 11 N. E. 300. We think the evidence in this case satisfies the rule and justifies the joinder complained of. The fundamental purpose of the suit is to insure the use of the church property in furtherance of the purposes of the trust under the terms of which it is held. In that purpose and in the relief sought all the appellees have a common interest.

The appellants call our attention to a decision of the Court of Common Pleas of Montgomery County, Ohio, which, on appeal, was determined *de novo* and decided in the same manner by the Court of Appeals of said county. While the case referred to involves a split in the congregation of the First Brethren Church of Dayton, Ohio, over so-called Grace and Ashland doctrines and in a measure sustains the appellants' contentions here, we do not regard the decision of a county court of Ohio as authoritative and being at odds with the holding in *Smith* v. *Pedigo, supra,* it must be rejected.

We find no error and judgment is affirmed.