CADMAN MEMORIAL CONGREGATIONAL SOCIETY OF BROOKLYN et al., Suing on Behalf of Themselves and Other Congregational Christian Churches Similarly Situated, Plaintiffs, *v.* HELEN KENYON, as Moderator of The General Council of the Congregational Christian Churches, Defendant.

Supreme Court, Special Term, Kings County, January 26, 1950.

*Davies, Hardy, Schenck & Soons* (*Kenneth W. Greenawalt* and *John H. Barber* of counsel), for plaintiffs.

*Wood, Molloy, France & Tully* (*Loren N. Wood* and *Loren T. Wood* of counsel), for defendant.

STEINBRINK, J. (orally). The plaintiffs in this case are the Cadman Memorial Congregational Society of Brooklyn, a religious corporation organized under the laws of this State, which

has the custody and control of the temporalities and property of the plaintiff church, and the Cadman Memorial Church, an unincorporated religious body connected with the first-named plaintiff, which has charge and control of the spiritual and religious functions of the plaintiff church.

The defendant, The General Council of the Congregational Christian Churches of the United States, is an unincorporated association consisting of more than seven members, with its principal office in the borough of Manhattan. It has a constitution, by-laws, and standing rules, which are annexed to the complaint as Exhibits A, B, and C, but in evidence in this action as Exhibits 3, 4, and 5. Neither the constitution of the general council, nor the by-laws or rules, have been amended in any respect which is material to the issues in this case. The council has what, by its by-laws, is designated as a Moderator, and Helen Kenyon, named as a defendant, holds that office and title.

The plaintiffs here ask for a declaratory judgment and injunction. The defendant, in addition to joining issue, has counterclaimed, and also asks for a declaratory judgment. Quite naturally, the conclusions that the litigants draw from the facts, which are either not denied, or it appears to the court are established, are diametrically opposed to each other. There has been no claim or counterclaim here for reformation of The Basis of Union or the Interpretations.

In the United States, there are approximately 5,715 churches of the Congregational Christian faith. A number of these have voted against and are opposed to the merger; also a considerable number have not voted either way on the merger. Of course, it would be an impossible task to bring all of these before the court, and for that reason, the plaintiff church is suing in its own name and on behalf of all other churches similarly situated.

The advice of all of the churches was sought with respect to the proposals contained in The Basis of Union, which is annexed to the complaint as Exhibit D, and is Exhibit 6 in this action. Of the 5,715 churches, 2,595 either did not vote, or voted " No ". The remainder of 3,120 voted " Yes." The breakdown of those not voting or voting " No " was that 1,433 did not vote, 1,162 voted " No ". Of all of the churches, 54% plus voted affirmatively. Of all of the voting churches, 72% plus voted favorably.

The plaintiff church is one of the Congregational Christian faith, and it concededly is independent and autonomous, as are all of the churches. Each one has full power and authority in its own right and is not subject to control of any kind by any ecclesiastical body, and particularly, is not subject to the jurisdiction, authority, or control of or by the general council. For

the purposes of fellowship and of co-operation and counsel in matters of common interest, the Congregational Christian Churches have caused to be organized various corporations and associations and conferences and the general council, all without jurisdiction or authority over the rights of individual churches, some of which are known as Congregational Christian Churches, others as Congregational Churches, still others as Christian Churches. All of them, however, are churches of the Congregational Christian faith.

The general council, as a voluntary, unincorporated association, was established to aid and advise the churches, but the council has those limited powers and purposes specifically enumerated in paragraph 2 of its constitution, which reads: " The purpose of the General Council is to foster and express the substantial unity of the Congregational Christian Churches in faith, purpose, polity, and work; to consult upon and devise measures and maintain agencies for the promotion of the common interests of the Kingdom of God; to cooperate with any corporation or body under control of or affiliated with the Congregational or Christian Churches, or any of them; and to do and to promote the work of these churches in their national, international, and interdenominational relations, and in general, so far as legally possible, to perform on behalf of the united churches the various functions hitherto performed by the National Council for the Congregational Churches and by the General Convention for the Christian Churches, it being understood that where technical legal questions may be involved the action of the several bodies shall be secured."

Parenthetically, it will be noted that significantly there is omitted any reference to questions of merger or union with any other faith or church.

In the preamble to this constitution, there is specifically a fundamental declaration. It reads: " We hold sacred the freedom of the individual soul and the right of private judgment. We stand for the autonomy of the local church and its independence of ecclesiastical control."

The general council has not now, and never has had, power or authority to make any contract or commitment binding upon the plaintiff church, or any of the Congregational Christian churches, which would in any manner affect the status of any of the Congregational Christian churches as independent or autonomous.

Under the provisions of the by-laws of the general council, there was set up a commission known as the " Commission on Interchurch Relations and Christian Unity ". As a result of

activity by the general council, or its commission, there was drafted by a joint committee made up of members of the Congregational Christian Churches, on the one hand, and the Evangelical and Reformed Church, on the other, a proposal for organic union, entitled " The Basis of Union of The Congregational Christian Churches and The Evangelical and Reformed Church ".

Each of the churches of the Congregational Christian faith has full authority in all its affairs, spiritual or temporal, including the right to or not to formulate and adopt a confession of faith, a creed, or a statement of belief, the ordering and administration of the sacraments, the order and content of its worship, the admission, discipline, and dismission of its members, the engaging and dismissing of ministers, and the management and disposition of its properties and funds. Unquestionably, each Congregational church is not only a separate entity and independent, yet it is Congregational practice for the churches to join in local associations and State conferences. It is through this means that they are afforded a greater measure of co-operation, as distinguished from union or consolidation.

Examination of the constitution and by-laws of the Evangelical and Reformed Church discloses that there is some fundamental or basic difference in the views, beliefs, doctrines, and practices held by this group, as distinguished from those of the Congregational Christian Churches.

The general council, through its executive committee, submitted The Basis of Union to the Congregational Christian Churches for their advice. As submitted, this Basis of Union contained these provisions:

" In late June, 1948, at the regular meeting of the General Council, the delegates will vote on the basis of the previous votes taken by the conferences, associations, churches, and members on the question of effecting the unions.

" It is recommended that the General Council vote approval of the union if 75 per cent of the conferences voting, 75 per cent of the associations voting, 75 per cent of the churches voting, and 75 per cent of the members voting have already approved The Basis of Union."

These quotes are to be found under the title of Procedures, with the subhead line, " The Congregational Christian Churches," which was a part of The Basis of Union, at page 3. The further procedural representation was made under this same title and subtitle of The Basis of Union that: " It is proposed that before April 1, 1948, the churches and their

members, and before June 1, 1948, the Conferences and Associations vote approval or disapproval of The Basis of Union.''

Seventy-five per cent of the churches voting prior to April 1, 1948, did not approve said Basis of Union, and 75% of the members of the churches which voted prior to April 1, 1948, did not approve said Basis of Union. The 75% vote was not obtained by June 1, 1948, and the churches were notified, as directed by the executive committee.

Notwithstanding this, the general council, at a meeting held at Oberlin, Ohio, in June, 1948, proceeded to take action on The Basis of Union, and, by resolutions proposed by the '' Commission on Interchurch Relation and Christian Unity,'' adopted said Basis of Union. A copy of the resolutions and of the preambles are annexed to the complaint and are in evidence as Exhibit 7.

The resolutions so adopted by the general council provided that if, by January 1, 1949, sufficient additional churches should have voted approval of The Basis of Union to make up, with those already approving, 75% of the voting churches, the executive committee should proceed to take the necessary steps to consummate the union, and that if said 75% of approval of churches should not have been so obtained before January 1, 1949, the executive committee should call a special meeting of the general council to further consider the matter. Here I pause to interpolate that it seems to this court that here was a clear recognition and representation by the general council that unless it had obtained the desired 75% affirmative votes of churches, conferences, associations, and members, that it would be regarded as a failure of approval, and that then no affirmative action would be taken.

Since the 75% of approval was not obtained, the executive committee called a special meeting of the general council, which convened at Cleveland, Ohio, in February, 1949. At this meeting, the general council, by resolution then and there adopted, approved The Basis of Union and provided for the consummation thereof. The Cleveland resolutions are annexed to the complaint and are plaintiffs' Exhibit 8 in this action.

The resolutions adopted by the general council in Oberlin in June, 1948, plaintiffs' Exhibit 7, contain certain Interpretations, but do not, in their terms, make its approval of The Basis of Union contingent thereon. By the resolutions adopted by the general council at Cleveland in February, 1949, plaintiffs' Exhibit 8, the Interpretations were made an essential part of this approval, and accordingly, a resubmission of the matter

to the appropriate bodies of the Evangelical and Reformed Church became necessary, and the consummation of the union became contingent upon approval of the Interpretations by the Evangelical and Reformed Church. It is admitted that The Basis of Union, with or without said Interpretations, has never been approved by 75% of the Congregational Christian churches which voted thereon, nor by 75% of the members thereof who voted thereon.

This court is not concerned in the slightest degree with what action the Evangelical and Reformed Church took, nor may this court in this action render any judgment affecting that body or group. It is not a party to the action, neither is it an agent of the general council, and the court has no jurisdiction over the Evangelical and Reformed Church, though it is admitted, by a failure to deny, that the appropriate bodies of the Evangelical and Reformed Church are now, or soon will be, engaged in the process of voting approval or disapproval of The Basis of Union, with the said Interpretations.

During this trial, and toward the end, it was disclosed that the Evangelical and Reformed Church had voted approval. Under the provisions of The Basis of Union and the Cleveland resolutions, if and when they have been approved by the Evangelical and Reformed Church, the General Council of the Congregational and Christian Churches will meet with the General Synod of the Evangelical and Reformed Church in joint session to consummate the union and to implement The Basis of Union by procedures, the details of which are set forth in The Basis of Union. From that time until a constitution of the new body has been prepared and adopted, it is intended that The Basis of Union shall regulate the business and affairs of the " United Church of Christ," which is to be the new name of these merged bodies.

The General Council of the Congregational Christian Churches, through its executive committee, up to the commencement of this trial, was taking steps and making all necessary plans and preparations for the prompt consummation of the union, in the event that the Evangelical and Reformed Church voted approval of The Basis of Union with the Interpretations.

There are at the present time in existence the following corporations, boards, or agencies possessing and controlling large sums of money:

(a) The Corporation for the General Council of the Congregational Churches of the United States, chartered under the laws of Connecticut, with funds and property for the purposes

of Congregational Christian Churches totaling more than $6,000,000.

(b) The American Board of Commissioners for Foreign Missions, organized under the laws of Massachusetts, and which is '' The agency of the Congregational Christian Churches for the extension of Christ's Kingdom Abroad,'' with assets of over $9,500,000.

(c) The Board of Home Missions of the Congregational Christian Churches, organized under the laws of Connecticut, New York, and Massachusetts, which is '' The agency of the Congregational Christian Churches for the extension of Christ's Kingdom in the United States,'' with assets of over $29,500,000.

(d) The Annuity Fund for Congregational Ministers, organized under the laws of New Jersey, which provides annuities for Congregational ministers, and has assets of approximately $14,000,000.

(e) The Retirement Fund for Lay Workers, a corporation organized under the laws of New Jersey, which provides annuity benefits for lay workers in Congregational Christian Churches, missionary societies, State conferences, colleges, hospitals, and so forth, under Congregational Christian auspices, with assets of more than $1,500,000.

There are other less important local or national boards, agencies, and corporations which have large assets.

Up to this point there appears to be no serious dispute, and almost every fact thus far stated is admitted by the pleadings. The first serious denial begins with the allegations of paragraph 23 of the complaint which alleges that the funds and other assets held by the various boards, agencies and commissions are held or controlled in trust for the benefit, work, interest and activities of the Congregational Christian Churches and for the purpose of carrying out and aiding the Christian way of life through the principles and polity of the Congregational Christian Churches.

It is a little difficult to understand how this allegation can be seriously denied, especially in view of the constitution of the general council, Exhibit 3, for the constitution and the by-laws, Exhibit 4, and the standing rules, Exhibit 5, together specifically provide under section IV, among other things, that the American Board of Commissioners for Foreign Missions shall be the agency of the Congregational Christian Churches (§ IV, subd. 1), and that the Board of Home Missions of the Congregational Christian Churches shall be the agency of the Congregational Christian Churches, etc. (§ IV, subd. 2). Like-

wise the Council for Social Action shall be the agency of the Congregational Christian Churches created by and responsible to the general council.

The roots of the Congregational Christian Churches in America go back to the year 1620, when a small band of 102 brave men and women on a bleak December day landed on the eastern Massachusetts shore. They were not bold adventurers in quest of gold or fabled treasure. Instead they sought release from a tyranny and thraldom that throttled conscience and imposed a spiritual slavery. They had broken away from the Church of England because they not only resented its control but they sought complete independence in their form of worship and their religious beliefs. Here in America they planted the seed of religious freedom and, through the centuries that have elapsed, nothing has occurred to disturb the autonomy of those churches of the Congregational faith which were thus established.

Now I turn in somewhat greater detail to some of the provisions of The Basis of Union. At the very outset it should be noted that this is not declared to be a basis of union of the general council and the General Synod of the Evangelical and Reformed Church, but rather of the Congregational Christian Churches and the Evangelical and Reformed Church. The preamble recognizing this, states, " We, the regularly constituted representatives of the Congregational Christian Churches," etc. They are representatives but never were designated such or empowered for the purposes here sought to be accomplished. There is then a provision in II, with reference to Faith. There has never been such a declaration in the long history of Congregationalism. Under III, subdivision D, there is provision for the constituting of the general synod. Heretofore there has been none. Under subdivision F, there is provision for the government of the United Church, exercised as therein declared so " That the autonomy of each is respected in its own sphere."

Significantly, there is no reference here to the separate churches and yet, " This Basis of Union defines those rights and responsibilities in principle and the Constitution which will be drafted after the consummation of the union shall further define them," etc.

Subdivision G provides for appeals, complaints or references which are advisory, not mandatory. Here I pause to observe that again there is the machinery for pressure through the shift of authority from the church to the United Church of Christ.

Subparagraph K provides that, "Baptism and The Lord's Supper are the recognized sacraments of the Church." That has never been obligatory upon the separate Congregational churches.

Under IV it is provided that, "The General Synod shall initiate action for the preparation of a constitution of the United Church." Never before have the Congregational Christian Churches been controlled by or under the aegis of a constitution. This is a radical departure.

Under subparagraph F there is provision for the preparation of a statement of faith. Then in subparagraph H, with a few that follow, there is the creation of machinery which has in it the dangerous possibilities not only of throttling conscience but of throttling the independence of the separate Congregational churches and usurping in a general over-all body the interest and property rights of these churches in all that they have created in the past excepting their own immediate and separate church property.

The same is true of VI, which deals with ministers and congregations, and whoever the draftsman was of provision VIII there is here a clear recognition that, "The Boards, commissions, and other agencies and instrumentalities" are the agencies of the churches. Then follow provisions for the merging of many, if not all, of these agencies, boards and instrumentalities. Again under IX there is the blanket statement that institutions which were under the supervision of the national bodies shall until a new constitution is adopted pass under the supervision of the general synod.

In X, "Approval and Implementation of The Basis of Union," there is the provision that, "From the time of the organization of the General Synod of the United Church until a constitution of the United Church has been adopted, this Basis of Union shall regulate the business and affairs of the United Church." Here again is almost complete change and surrender, and even The Basis of Union may be revised and amended at any time before the adoption of a constitution on consent of 90% of the members of the general synod.

None of this may have this court's approval.

In our social, religious and political life there has been a tendency on the part of many towards centralization and control. Unity does not mean uniformity. Can anyone conceive of a choral society made up entirely of sopranos or of an orchestra made up entirely of violins or cornets where each

player insists on playing his own tune? How long would any-one sit by and listen and regard it as music?

We are told that the sunlight as reflected in the spectrum has all of the colors. Scientists tell us that if any one of these colors could be blotted out it would no longer be pure sunlight and that with the obliteration of sunlight every living thing on earth would perish within a few days.

If, as is contended, the general council could do whatever it pleased since it was unincorporated and merely an association of individuals, then why was it necessary to invite or take a vote? The court poses the question, " Is the name Congrega-tional Christian Churches to be discarded? " If the answer is in the affirmative, it carries with it condemnation of this plan. If the answer is in the negative, then why is the proposed union to be known by the name United Church of Christ? Nowhere in the history of Congregationalism is the court able to find any basic document providing for the government of the Congregational Christian Churches, but the third section of The Basis of Union entitled " Practice," subdivision F does provide for the government of the United Church of Christ. It is hedged about by words of attempted limitation, but the whole plan is postulated on union.

So, too, though insisting that churches, associations, con-gregations, ministers and conferences remain free, there is nevertheless in subparagraph G of III provision for appeal, complaint or reference, but such decisions are advisory, not mandatory. Here is the medium for the application of pressure on ministers and churches. Here again is a shift of authority even though in guarded form from the church to the United Church of Christ.

In addition to the attempt to set up a General Synod of the United Church of Christ there is also laid the foundation for negotiating a constitution. The Basis of Union is, as already indicated, filled with loopholes and inconsistencies, and yet the constitution which is to be drawn, it is stated, " shall be based upon the principles set forth in this Basis of Union."

Also, the question immediately presents itself that if the members of the general council acted as individuals, then by what right did the council use funds contributed directly or through associations or conferences from Congregational churches to bombard all these churches with propaganda in favor of the merger? Again, the court poses the question, if this Basis of Union is brought to fruition, will the general council cease to exist or function? And if the answer is in the

negative, then why the Basis of Union? Certainly the field for co-operation in religious matters is broad enough for the council, remaining within its own periphery, to work in perfect harmony with those of other faiths. Whoever helps to spread knowledge of the fact of the essential unity of all religions will earn the gratitude of millions who suffer because of ignorance of this universality.

The Basis of Union connotes and points toward a centralized body whose limitations are not yet defined because of clauses to which attention has been and will later be directed.

The Basis of Union is a conglomeration of confusion and conflicting statements with a cacophony of ideas. There are so many vague provisions in the Basis of Union; there are so many differing viewpoints as illustrated by the testimony of both clerics and laymen who have testified, and more especially emphasized in the defendant's trial brief, where in supplement No. 1, there are numerous quotations from The Basis of Union followed by the statement, "This requires explanation." If defendant's counsel believes that so much of The Basis of Union requires explanation, then it is small wonder that the nonlegal mind, and especially the ministers, sense danger to themselves and to their churches in this document.

The court repeats that unity among men of all faiths is desirable. The reason may be found in a quotation from a book written more than a half century ago, The Crisis: "Wars and schisms may part our bodies but stronger ties unite our souls."

At least at one point in the testimony it appeared that one or more ministers' standing with their association or conference would be endangered if they withdrew from membership or failed to continue paying their dues. It also appears that the spiritual kinship between the Congregational Christian Churches, frequently spoken of as fellowship, was in danger of destruction by the trend towards centralization in the Congregational denomination. These pressures began from the top and filtered down, while theretofore authority was in the separate churches and, being the source of it, it went up from the churches to the council.

The Congregational Publishing Society is one for which the Board of Home Missions acts as agent. "It does not appear that the National Council of the Congregational Christian Churches ever voted on The Basis of Union or the Interpretations, nor did the General Convention of Christian Churches."

The Board of Home Missions is made up of three classes of members, the first including all the members of the general

council; the second 250 members-at-large; the third, those persons who were life members of the seven organizations, " for which the Board of Home Missions acts as attorney and agent."

Concededly, no Congregational Christian church ever authorized the general council to negotiate this Basis of Union nor the Interpretations.

The court finds itself in agreement with the distinguished authority, William E. Barton, who, throughout this trial, was repeatedly referred to by both counsel for plaintiff and defendant. In his book, *The Law of Congregational Usage*, in the subchapter on the National Council, beginning at page 420, he said, " The danger that the National Council will sometime assume larger functions than belong to it and commit the denomination to disastrous policies is not wholly imaginary. The history of denominational organization abounds in warnings. The love of power grows easily among those who come to possess it, and some organizations, very innocent in their inception, have developed large and insidious powers of usurpation."

Before the Cleveland meeting, November 10, 1948, only about 13% of the more than one million members voted " Yes " with regard to The Basis of Union. This was a rather small minority of the members. It might be observed that just as dripping water will wear away stone, so here there is imminent danger of accretion which will gradually but nonetheless relentlessly undermine the independence and autonomy of the separate Congregational Christian churches.

In subparagraph (h) of the resolutions which are part of the Interpretations, there is the bold and forthright statement that, " With the constituting of the General Synod of the United Church of Christ, the General Council of the Congregational Christian Churches will remain in existence in order to fulfill necessary legal functions, but shall transfer to the General Synod all of its functions which do not for legal reasons need to be retained." No weasel words can befog the provisions of paragraphs (c) and (h) of Exhibit 7.

For many years, the commissions, boards or agencies accumulated very large funds. Now it is sought at one fell swoop to turn these over through union with similar boards or agencies of the Evangelical and Reformed Church, which is under the control of its general synod. Such action would, to my mind, be catastrophic to the separate Congregational Christian churches. By so doing all of the present advantages which inure to these separate churches may be wiped out.

On the whole, this plan of union, it appears to this court, is a destruction and not a promotion of fellowship, for through many years the missions and other boards and agencies were inextricably interwoven with the Congregational Christian Churches. It needs no genius to detect that the general council, controlling the building society, could easily put the screws on all dissenting churches which it has heretofore aided if any of them were to oppose this union. Nothing is to be gained by reciting each item of evidence establishing that these boards, commissions, missions or societies are agencies of the Congregational Christian Churches.

In the *History of American Congregationalism,* by Atkins and Fagley, at page 341 it appears that as related to Congregational principles, '' the first principle is that the only official Congregational Church is a local congregation which enjoys complete autonomy. Whatever organizations there are beyond a congregation, as the association, the State Conference, or the National Council, are only advisory organizations.''

On cross-examination the witness. Scott testified: '' Q. It says in effect there, does it not, that if a church wants to it can remain independent but it will give up its rights in the United Church organization agencies? A. That is what it says.'' How in the face of this can anyone contend that each autonomous church will still retain all of the rights which it previously enjoyed? Such a suggestion, it seems to me, is indulging in mental gymnastics based upon devious thoughts expressed in more devious language.

In the Interpretations, Exhibit 7 in this action, there is the opening declaration or confession that, '' The Basis of Union calls for a union of the Boards of Home Missions, the Boards of Foreign Missions, the Annuity Boards, the Councils for Social Action, and similarly all related Boards, Commissions, Agencies and instrumentalities of the two denominations.'' This again demonstrates the surrender of autonomy.

The Interpretations, under the resolutions in the first column, subdivision (g) provide, '' The United Church of Christ will be a union of two denominations joined in fellowship and cooperation without involving any invasion of the rights now enjoyed by local churches or congregations.'' If all that this means is co-operation, that could easily have been achieved without the confusion in The Basis of Union or the more intricate and confusing Interpretations. It does not say that the United Church of Christ will be a union joined in fellowship, and so forth, but rather that it will be a union of two denominations, and so forth.

It must be assumed, again, that the draftsman did not use the term " denominations " without knowing what that word meant and implied, for the general council is not a denomination.

It is the defendant's position that the general council had the right, completely autonomous in its own sphere, to take the action which was taken even though they were asking the churches to vote on it. The Moderator of the defendant when asked on cross-examination, " Is a new denomination being formed by this United Church of Christ? " answered, " It is our hope that there will be." And further she stated that, " It will be a new denomination."

The Moderator, it seems to this court, should be like an impartial chairman, but here was most active for the merger. Complete autonomy of each local congregation is one of the two fundamental characteristics of congregationalism, and where that is lacking it is no longer Congregational. " The members of these Councils have always felt perfectly free acting in their own name." (Atkins and Fagley, p. 342.) This cannot be distorted from the plain meaning of words, namely, " The members. * * * acting in their own name " to mean that the council itself was perfectly free. The members were individually, but not joined together, speaking for the general council or the Congregational Christian Churches. All of these organs of fellowship, namely, associations, conferences and general council, are autonomous and have no power over any other organization.

It appears that if a church wants to it may remain independent, but it will give up its rights in the United Church organizations and agencies. (See Exhibit 28, Schlaretzki's Analysis, subdivision D-2, on page 4 of the exhibit.)

In this same exhibit there is further evidence that the fear on the part of separate churches and ministers is well founded. In paragraph 4 it is stated that: " The national boards, commissions, agencies and instrumentalities would be co-related into united units * * * until such time as a permanent Constitution for the denomination had been accepted by the General Synod."

Again, this same danger inheres and is recognized by Schlaretzki in Exhibit 28, page 4, IV subdivision D-2; and sub-paragraph 2. Speaking of the churches which do not enter, Schlaretzki says: " It would naturally give up those rights in united church organizations and agencies, though if it desired it could continue to have such relationships with such bodies

as would be possible to a church not a member of the denomination.''

With regard to ministers, on page 5, paragraph 1, subsection 2: '' As a candidate for the ministry: — he would be licensed or retained as a minister by his Association, Conference or Synod in the same way as before the union until a standard method was provided by the Constitution.''

Once more I repeat — no one yet knows what that constitution will provide, though later, on page 6, II, paragraph 3, with reference to a minister not entering the Union, he states: '' But to the extent that the ' standard denominational procedure ' was worked out and accepted by the Churches, this possibility would become more remote.''

It is readily conceded, I take it, that the administration of specific trusts or funds held for specific purposes will continue in keeping with the terms of the trust.

When the witness Scribner was on the stand the court read to him that paragraph of the constitution of the general council already quoted, paragraph II, and when this was pressed by the court, '' What was just read, doesn't that indicate that the general council is acting for the Congregational Christian Churches? '' eventually the answer was, '' Yes, that is my position.''

This witness Scribner asserted the incorrectness of the first sentence of the preamble to the Basis of Union as well as other things.

The Board of Home Missions decides how much or what percentage of the apportionment money which is received from the churches for missionary work is to be allocated to each of the seven societies. These bodies receive certain delegated authority from the churches for certain purposes which are set forth in their constitutions. (Douglass, cross-examination, 2463.)

This witness at pages 2932 and 2926 expressed the opinion or belief that there had been a ruling in a case somewhere in the South. The witness said that he believed that that case declared a Christian church to be a connectional church and possessed itself of certain properties on the basis of that decision. I think the witness was in error. The court has examined that case. The greater part of the decision and opinion in that case had to do with the failure of the appellant to make up the case or record on appeal in keeping with the statute. It was the case of *Western North Carolina Conference* v. *Talley* (229 N. C. 1, 8). It was a civil action

to recover land as church property allegedly wrongfully withheld by defendants. The court in that case said (p. 8), among other things: "It is immaterial whether Pleasant Cross Christian Church is congregational or connectional, and decision thereon is unnecessary on this record."

But then the court went on to say (p. 8): "Nevertheless, it may not be amiss to call attention to the principle enunciated and applied by this Court in *Kerr* v. *Hicks*, 154 N. C., 265, 70 S. E., 468, in opinion by *Clark, C. J.*, that ' in church organizations, those who adhere and submit to the regular order of the church, local and general, though a minority, are the true congregation ', citing *Roshi's Appeal*, 69 Pa., 462, 8 Am. Rep., 280; *Gable* v. *Miller* (N. Y. Chancery Court), 10 Paige, 627.''

The witness Van Dusen expressed himself emphatically that he did not believe that there had to be an organic union of the Protestant churches, and further that while he believed in one organism he did not say one organization. Furthermore, he made the significant admission that any organization, and in this were included the local churches, which entered into any kind of relationship with any other organization, surrenders some measure of its previous autonomy.

This court subscribes to his statement that there are many different ways of working out a Christian unity which does not necessarily involve The Basis of Union before the court in this case.

He testified further that there are many different ways in which you can effect at least preliminary steps toward the ultimate ideal of Christian unity.

Defendant's counsel, in questioning the witness Douglass, referred to the Board of Home Missions' action " with respect to any one of the seven societies for which it was acting as agent." In the light of all of this, how possibly can this court find other than that the Board of Home Missions and these other societies and boards are agents of all of the Congregational Christian churches and responsible to them for their acts?

As a part of defendant's Exhibit A there is annexed Appendix D, consisting of two pages, the first of which is a joint statement of the executive committee of the two bodies of the Congregational Christian Churches and the Evangelical and Reformed Church. This joint statement contains a declaration by the general council declaring that the Interpretations are " in harmony with the spirit and purposes of the Basis of Union." Who is to say that they are in harmony with the

spirit? How is this to be ascertained excepting it be found in the language used?

Further in this document there is a statement that the action of the general council at Oberlin makes these Interpretations equally authoritative so far as the entrance of the Congregational Christian Churches into the proposed Union is concerned; and the general council, rather daringly it seems to me, states that the Congregational Christian Churches will come into the Union on the Basis of Union and the Interpretations.

Later in this joint statement there seems to me a recognition that the general council cannot carry the churches into the Union, for it speaks of the Evangelical and Reformed Church voting " upon being notified that the Congregational Christian Churches are ready to unite pursuant to the action at Oberlin.'' Later there is expressed the hope that the United Church " may in due course of time develop a polity which  *   *   *  will be free to adjust itself to the needs of the times.'' Of course, what that polity will be no one can prophesy.

In the second page of Appendix B there is a letter missive to all Congregational Christian Churches from the committee of fifteen in which this committee of a limited number of men declares that " the joint statement now recognizes the Oberlin Interpretations as unequivocally authoritative.'' Where the committee of fifteen finds the basis of arrogating unto itself the power here implied I am at a loss to understand. But still again, as late as November 11, 1948, the same committee of fifteen declared " It should be noted that in accordance with the action taken by our General Council at Oberlin an affirmative vote of 75% of the churches voting must be secured by January 1, 1949.''

In Exhibit 19, which is the constitution and by-laws of the Evangelical and Reformed Church, under article 2, provision 28, page 11 of the exhibit, it is stated: " The Synod shall have legislative, administrative and judicial functions.'' Then follow further details with regard to these functions and among them is included: " The admission and dismissal of ministers and congregations.'' This is wholly foreign to the entire polity of the Congregational and Christian churches. Under the provisions for the general synod, in article 2, provision 33, at page 12, it is definitely stated that the Evangelical and Reformed Church shall enact its legislation through the general synod. Certainly this involves a surrender of autonomy such as Dr. Van Dusen referred to.

It is unnecessary for the purposes of this decision to discuss the various opinions and beliefs with regard to the religious questions which have been injected by some of the witnesses during the trial. Since there is little dispute concerning the material facts, much that is collateral appears in this record through no fault of the court for counsel with commendable liberality have permitted each other to introduce evidence which, on objection, might properly have been excluded. It seems idle to say that The Basis of Union is intended to be binding only on the General Council of the Congregational Christian Churches. The court calls attention to the fact that nowhere is it suggested, even by those responsible for this document, that it is intended as a union of the general council with the Evangelical and Reformed Church, but its very title " Basis of Union of The Congregational Christian Churches and The Evangelical and Reformed Church " negatives this suggestion.

No one can read it in conjunction with the title, preamble and the content of what follows without coming to the irresistible conclusion that it was projected to guide a union " of The Congregational Christian Churches and The Evangelical and Reformed Church."

Its very preamble begins with the words " We, the regularly constituted representatives of The Congregational Christian Churches." In article II there is a confession of faith clearly intended not for the general council but for the Congregational Christian Churches. The Basis of Union itself makes a distinction between these Congregational Christian Churches and what might be termed in practice " the local church." At the present time some of the Congregational Christian churches have conscientious objections to any prescribed confession of faith outside of the New Testament itself. And this very confession of faith may be regarded as a fundamental difference between the two groups which it is intended to merge.

The exhibits, 185 in number for the plaintiff, and 63 for the defendant, set forth authoritative statements which are the recognized and accepted beliefs and position of the Congregational Christian Churches and of the membership thereof. According to the oral and documentary evidence introduced, it is entirely clear that there is a large group that is willing to submerge itself in striving for a so-called union with the Evangelical and Reformed Church, while as opposed to this there are earnest men, both lay and ministers, who have divergent doctrinal and religious views and beliefs. Their earnest and vigorous attitude for both plaintiffs and defendants indicates

quite a difference in these views and beliefs and also leads to the conclusion that aside from other matters which will be dealt with hereafter, these differences are basic and fundamental and not a mere matter of the internal affairs of any one church.

Through many decades and generations the various organizations, missions and societies, by whatever names they may be called, have accumulated the large funds already referred to, which, as agencies of the general council and as agencies, in turn, of all the Congregational Christian churches, have been used for the purposes expressed in their separate charters or certificates of incorporation. These are threatened with amendment which may pass the control, in whole or in part, into hands foreign to those of the Congregational Christian Churches. Here are involved basic property and temporal rights.

This court may deal only with legal concepts and not with spiritual ones. This court does not deal with any ecclesiastical question, though it may be pointed out that the Evangelical and Reformed Churches have a central body of control while the Congregational Christian Churches never have had. What form of constitution will evolve if The Basis of Union becomes an actuality no one can predict. But danger is inherent in the instrument itself. It has been the practice for many years for the separate Congregational Christian churches to affiliate with any local Association and any State Conference in carrying on part of their work and activities.

Now the court turns to decisions rendered by other higher courts in this State as well as decisions in other States where kindred questions have been litigated and decisions rendered which this court accepts as sound.

That injunction is a proper remedy to settle the rights of two discordant factions of a church congregation with respect to use and control of church property is no longer a debatable question. (*Williamstown Baptist Church* v. *Henley,* 158 Kan. 324.) In this State, as in others, it has been expressly held that controversies over theological questions and matters ecclesiastical in character are to be determined by the authorities of the particular church involved according to its laws and usages and that ordinarily the civil courts will not take jurisdiction to review or control the decisions of duly constituted church authorities. On the other hand, it has been repeatedly recognized and the rule applied that where such controversies involve civil or property rights the civil courts will take jurisdiction and decide the merits of the case for themselves.

In Corpus Juris (Vol. 54, Religious Societies, §§ 164, 167), there will be found a sound statement of the underlying principles distinguishing the power of civil courts from those of ecclesiastical courts, but it remains that " if civil rights, as contradistinguished from ecclesiastical questions, are passed upon by a church tribunal, the secular courts will, as a general rule, decide the merits of the case for themselves. But, according to the rule broadly stated by some courts, when a civil right depends upon some matter pertaining to ecclesiastical affairs, the civil tribunal tries the right and nothing more, taking the ecclesiastical decisions out of which the civil right has arisen as it finds them, and accepting such decisions as matters adjudicated by another legally constituted tribunal. Thus, the decisions of church tribunals as to questions of discipline, faith, or ecclesiastical rules, custom, or law affecting the members of the church must be accepted by legal tribunals as final and binding upon them in their application to a case before them " (45 Am. Jur., Religious Societies, § 41, at p. 752). This court's failure or refusal to deal with the basic question before it would leave the determination of rights in whatever property the general council now has or the funds of its various agencies, both precarious and uncertain. (*Trinity Church of Infinite Science of Minneapolis* v. *First Spiritualist Church,* 221 Minn. 15.)

" 'The only concern of courts with the differences of creed or belief within or between religious organizations is when some property or contract rights are involved and demand protection. It is, however, fully established by our own court, in common with most others, that when property has been acquired,' " either for a specific purpose or " ' for the maintenance and support of the faith of any recognized denomination or church, every member  *  *  *  has a right to resist its diversion to other [purposes or] antagonistic uses, whether secular or religious, and therefore those who hold the title or control,  *  *  *  [be] charged with a trust to apply it to the uses for which acquired, and not to inconsistent ones ' " nor to turn it over to others for administration. (*Kerler* v. *Evangelical Emanuel's Church,* 235 Wis. 209, 214–215; see, also, *Marien* v. *Evangelical Creed Congregation,* 132 Wis. 650, 652.)

While all recognize that there is no ecclesiastical authority applicable to the Congregational Christian Churches, yet, in *Gable* v. *Miller* (10 Paige Ch. 627, 640) there is language that seems apposite: " The fact that the minister, consistory, and church were then in actual ecclesiastical connection with the

Dutch Reformed churches, and that no one at that time contemplated a separation, is conclusive to show that it was perfectly well understood that the ecclesiastical organization, as well as the doctrines, of this church was to continue the same in substance. Those who contributed to the funds of this society therefore, whoever they were, made their donations with the intention of dedicating them to the pious use of erecting and sustaining a place of worship and for the preaching of the gospel in accordance with such doctrines   *   *   *."

And at page 647: " Upon the principles of these decisions, I think the temporalities of this church must be decreed to belong to the complainants, and to such others of the church and congregation as adhere to their ecclesiastical connection with the classis of New York, and are recognized by that body." (Also see *Baptist Church in Hartford* v. *Witherell,* 3 Paige Ch. 296, 301, and *Lawyer* v. *Cipperly,* 7 Paige Ch. 281, 283, 287.)

It was said in *Field* v. *Field* (9 Wend. 395, 400): " If there has been, or is about to be a diversion of the fund from the original purpose and object of it, under the form of legal and constitutional proceedings by the association, or otherwise, it belongs peculiarly to the jurisdiction of a court of equity to interpose and correct or prevent the procedure. Thus if the object of the original contributors of this fund was the instruction and education of their children in the faith and doctrines of the society of Friends, as understood and believed at the time it was placed under the direction of one of their associations or meetings, it is quite clear, both on principle and authority, that such object should be strictly observed by those who have the management of it, and that an ample remedy exists against any perversion of the fund. In such case the question is not which faith or doctrine is the soundest or most orthodox; this is not the object of the enquiry, but for what object or purpose was the fund originally established by the founders of it?"

Authorities generally hold that property given or set apart to a church or religious association for its use in the enjoyment and promulgation of its adopted faith and teachings is by said church or-association held in trust for that purpose, and any member of the church or association less than the whole may not divert it therefrom. (*Watson* v. *Jones,* 13 Wall. [U. S.] 679.)

In *Roshi's Appeal* (69 Pa. 462, 468), the rule was laid down that " 'The title to the church property of a divided congregation is in that part of it which is acting in harmony with its own law, and the ecclesiastical laws, usages, customs and prin-

ciples which were accepted among them before the dispute began, are the standard for determining which party is right.' "

This court is not concerned with consequences in the sense' that consequences, however serious, may excuse an invasion of the rights of others.

If the court were here dealing with a contract which had been in effect for some period of time and under which the parties had acted, there might then be room for evidence with respect to the interpretations which the parties themselves placed' upon the contract by their conduct.

The construction of a written instrument, plain and unambiguous in its language, is a question of law for the court, and before a jury, it would be error to permit the introduction of evidence tending to show that the words mean something more than their plain language indicates. (*Wood* v. *Glens Falls Automobile Co.*, 174 App. Div. 830, 835.)

In *Brainard* v. *New York Central R. R. Co.* (242 N. Y. 125), the court had occasion to deal with this question, and at page 131, said: " The words chosen by the parties should not be unnaturally forced beyond their ordinary meaning. (*Codman* v. *American Piano Co.*, 229 Mass. 285.) "

And further said the court (p. 133): " But it is urged that the triers of fact have conclusively fixed another sense in which the words were used in the contract before us as based on the intention of the parties and' the practical construction given by them to the language of the lease. The construction of a plain contract is for the court. The intention of the parties is found in the language used to express such intention. (*Hartigan* v. *Casualty Co.*, 227 N. Y. 175.)"

" 'If the court finds as matter of law that the contract is unambiguous, evidence of the intention and acts of the parties plays no part in the decision of the case. Plain and unambiguous words, undisputed facts, leave no question of construction except for the court. The conduct of the parties may fix a meaning to words of doubtful import. It may not change the terms of a contract.' " (*Gearns* v. *Commercial Cable Co.*, 293 N. Y. 105, 109.)

The word " agency " imports the contemporaneous existence of a principal (*Wozniak* v. *Siegle*, 226 Ill. App. 619). There is no agency unless one is acting for and in behalf of another. (*Bertrand* v. *Mutual Motor Co.*, 38 S. W. 2d [Tex.], 417–418.)

As respects basis for predicating liability of the principal for acts of the subsidiary, " Agency," " Adjunct," " Branch," " Instrumentality," " Dummy," " Buffer," and " Tool " all

mean very much the same thing. (*Lowendahl* v. *Baltimore & Ohio R. R. Co.*, 247 App. Div. 144, 156.)

" Merger " means to sink or disappear in something else, be swallowed up, lose identity or individuality. (*Marfield* v. *Cincinnati D. & T. Traction Co.*, 111 Ohio St. 139.)

" Merger " is the absorption by one of another. (*Ahles Realty Corp.* v. *Commissioner of Internal Revenue*, 71 F. 2d 150, 151.)

" Union " means a combination. It may also mean a combination or association. (*State* v. *Standard Oil Company*, 218 Mo. 1.)

And long before either of these decisions, the United States Supreme Court, in *Insurance Co.* v. *Dutcher* (95 U. S. 269, 273) said: " The practical interpretation of an agreement by a party to it is always a consideration of great weight. The construction of a contract is as much a part of it as anything else. There is no surer way to find out what parties meant, than to see what they have done. Self-interest stimulates the mind to activity, and sharpens its perspicacity. Parties in such cases often claim more, but rarely less, than they are entitled to. The probabilities are largely in the direction of the former. In considering the question before us, it is difficult to resist the cogency of this uniform practice during the period mentioned, as a factor in the case."

In that case, there was a contract under which the parties had already acted.

In *Irvine* v. *New York Edison Co.* (143 App. Div. 344, 352–353), the court had before it a question of merger of two corporations, and in the course of the opinion in that case, the court said: " The precise effect of such a merger upon the merged corporation has not been passed upon in this State, but in other jurisdictions it seems to be recognized that the merged corporation is extinguished, except in so far as the statute may keep it nominally alive for specified purposes. (*Central Railroad, etc., Co.* v. *Georgia*, 92 U. S. 665; *Railroad Co.* v. *Georgia*, 98 id. 359; *Adams* v. *Yazoo & Mississippi V. R. Co.*, 77 Miss. 194; 60 L. R. A. 33.) And that it should be completely absorbed in the merging corporation is consistent with the meaning of the word ' merger ' as used by the lexicographers, who define the word as meaning an absorption or swallowing up so as to involve a loss of identity and individuality. (Cent. Dict.; New Oxford Dict.) "

The only case that this court has been able to find, where a question of union or merger was dealt with as between religious

societies was the case of *Ramsey* v. *Hicks* (44 Ind. App. 490). There the question arose of a merger between the Cumberland Presbyterian Church with another. The court said (p. 511): " The plan of union provided for the merger of the Cumberland Presbyterian Church into the Presbyterian Church in the United States of America. To merge is to ' swallow up.' March's Thesaurus Dict. Merger is ' the absorption of a thing of lesser importance by a greater, whereby the lesser ceases to exist but the greater is not increased.' Bouvier's Law Dict. A consolidation takes place when both companies are extinguished and a new one created, taking over the holdings of those passing out of existence. *Adams* v. *Yazoo, etc., R. Co.* (1899), 77 Miss. 194, 24 South. 200, 317, 28 South. 956, 60 L. R. A. 33; *McMahan* v. *Morrison* (1861), 16 Ind. 172, 79 Am. Dec. 418; *Clearwater* v. *Meredith* (1863), 1 Wall. 25, 17 L. Ed. 605; *St. Louis, etc., R. Co.* v. *Berry* (1884), 113 U. S. 465, 5 Sup. Ct. 529, 28 L. Ed. 1055 Clarke & Marshall, Priv. Corp., p. 1042. A consolidation is also defined as a union of two or more corporations, which necessarily results in a new one. *Adams* v. *Yazoo, etc., R. Co., supra*; *State ex rel.,* v. *Montana R. Co.* (1898), 21 Mont. 221, 53 Pac. 623, 45 L. R. A. 271; *Miles Lamp Chimney Co.* v. *Erie Fire Ins. Co.,* (1905), 164 Ind. 181; *Town of Longview* v. *City of Crawfordsville* (1905), 164 Ind. 117, 68 L. R. A. 622; *McMahan* v. *Morrison, supra.*"

Further (p. 512) the court, quoting, says: " 'No principle is better settled than that property conveyed to trustees for the use of a church by its denominational name, as was the case here, creates a trust for the promulgation of the tenets and doctrines of that denomination.' *Smith* v. *Pedigo* (1896), 145 Ind. 361, 416, 19 L. R. A. 433. See, also, *Mt. Zion Baptist Church* v. *Whitmore* (1891), 83 Iowa 138, 49 N. W. 81, 13 L. R. A. 198; *Park* v. *Chaplin* (1895), 96 Iowa 55, 64 N. W. 674, 59 Am. St. 353, 31 L. R. A. 141; *Lamb* v. *Cain, supra*. The property being held in trust for the purpose named, the title to it is in that part of a divided congregation which is acting in harmony with its laws, usages, customs, and principles. *Smith* v. *Pedigo, supra; White Lick Quarterly Meeting, etc.* v. *White Lick Quarterly Meeting, etc.* (1883), 89 Ind. 136; *Yanthis* v. *Kemp* (1907), 40 Ind. App. 649; *Park* v. *Chaplin, supra.*"

" An injunction not only restrains the parties to the action in which it was granted, but also, when so drawn, those who act under or in connection with a party, as attorneys, agents or employees. No person with knowledge of the terms of an injunction, even if not a party himself, can aid or co-operate

with a party in doing the prohibited act without incurring the penalty prescribed by statute.'' (*People ex rel. Stearns* v. *Marr*, 181 N. Y. 463, 468; *People ex rel. Empire Leasing Co.* v. *Mecca Realty Co.*, 174 App. Div. 384, 389.)

There will be judgment here for the plaintiffs. The judgment to be entered herein will:

(1) Declare that the General Council of the Congregational Christian Churches of the United States has no power or authority on behalf of or in the name of the separate churches to proceed with or to carry out and consummate The Basis of Union of the Congregational Christian Churches and the Evangelical and Reformed Church;

(2) Declare that such General Council of the Congregational Christian Churches, as a representative body, has no power or authority to merge or unite itself with the Evangelical and Reformed Church, or with the general synod thereof, or with any other body or organization whatsoever.

(3) Declare that no act or acts whatsoever taken by said General Council of the Congregational Christian·Churches in consummation or in attempted consummation of The Basis of Union of the Congregational Christian Churches and the Evangelical and Reformed Church can or will affect in any manner the separate Congregational Christian churches, except insofar as individual churches shall, by independent action, unite with the new church or religious body attempted to be created under said Basis of Union.

(4) Declare that no act or acts taken by the General Council of the Congregational Christian Churches in consummation of or attempted consummation of the proposals in the said Basis of Union, with or without its Interpretations, can or will control in any manner the plaintiffs, or the several individual Congregational Christian churches, with respect to their temporal or spiritual rights or possessions.

(5) Declare that any act heretofore taken by a separate Congregational Christian church, in voting for or against the proposals contained in said Basis of Union, either with or without the Interpretations, will not commit it as a member, or to become a member, of the fellowship called '' The United Church of Christ '' or '' The General Synod of the United Church of Christ,'' or other organization contemplated by the proposals in said Basis of Union, and that the failure of any individual Congregational Christian church to vote either for or against the consummation of the proposal, or refraining from voting on these as contained in said Basis of Union, will not commit

it as a member, or to become a member, of the fellowship called " The United Church of Christ," or any synod, or other organization provided for in the provisions of The Basis of Union.

(6) Declare that any act of the General Council of the Congregational Christian Churches cannot and will not make the plaintiffs or the several separate Congregational Christian churches, members of the proposed fellowship of Congregational Christian Churches and Evangelical and Reformed Churches to be called " The United Church of Christ," or any synod thereof.

(7) Declare that the policy of the Congregational Christian Churches is that system of church organization which recognizes the independence and autonomy of the local church in all matters temporal and spiritual, and the association of churches through voluntary, independent organizations devised for fellowship and cooperation but without ecclesiastical authority.

Nothing stated herein is to be interpreted as restraining or preventing the individual members of the council, as individuals, from affiliating themselves with the Evangelical and Reformed Church, but, in doing so, they speak for themselves, and not for the Congregational Christian Churches.

Excepting insofar as findings have been made in harmony with the allegations contained in the counterclaim, or in the prayer for judgment thereof, the counterclaim is dismissed on the merits, but findings not inconsistent will stand.

The defendant's motions, other than those relating to amendments which were granted, are denied.

Additional findings and additional provisions in the judgment to carry out what has here been stated will be made, but these must be submitted promptly, and any other related questions may be taken up whenever it is convenient to counsel.

There will be an exception, of course, to the defendant.